The Western & Atlantic Railroad Company *v.* Evans.

The testimony of the plaintiff, who was the sole witness in his own behalf as to the circumstances under which he was injured, making at best a very weak and doubtful case, it being as a whole utterly inconsistent with itself and self-contradictory as to the most vitally important facts, and one version of it showing clearly that he was not entitled to recover, and the defendant's evidence, which was perfectly consistent with this version, establishing a complete defense, the verdict in the plaintiff's favor was unwarranted, and the ends of justice require a new trial.

July 29, 1895.

Action for damages.  Before Judge Milner.  Catoosa superior court.  August term, 1894.

The declaration alleged, that the plaintiff, while engaged in his duties as a track-hand on the railroad, in running a hand-car under the superintendence of Mitchell, just as the hand-car was going around a curve about 100 yards north of Ringgold depot, it met and ran upon what is known as an extra train; that when the train was about to run into the hand-car, and under the excitement and great danger created thereby, Mitchell, plaintiff and four others, hoping to save their lives thereby, all left the hand-car, and plaintiff landed in a deep rock culvert and was injured as described; that he was free from fault, and the casualty resulted from a failure of other servants of the railroad company to exercise ordinary and reasonable care, and from the carelessness of Mitchell in not leaving out a flagman and proper flag; also, from the failure of those in charge of the train in running through the corporation of Ringgold (in which the casualty occurred) at the rate of twenty

or thirty miles per hour, and in running at that rate within less than 200 yards of said public crossing, and failing to ring the bell in passing through said corporation, or to blow the whistle at the crossing, or in any wise to observe the statute law with regard to such places. There was a verdict for plaintiff for $200, and defendant's motion for a new trial was overruled.

Plaintiff testified: I was working for defendant as a track-hand about the last of June, 1893, under Mitchell, section boss on the section in which Ringgold is situated. We started from two miles north of Ringgold to go with the crank-car to a bridge south of Ringgold. On the crank-car were Mitchell the boss, two civil engineers, Green, Hall, Alexander, Thomas and myself, track-hands. The four last named were propelling the car, Thomas and myself in front and Hall and Alexander behind. As we came into Ringgold we were running ten or twelve miles an hour. When about 200 yards above the depot, Mitchell discovered an extra freight-train coming toward us, and told us it was coming. He, the two civil engineers and Green jumped off, and I tried to do so. As I got off I fell in a hole or waterway running across the track, and hurt my side and chest and leg. A piece of rock cut me on the shin down to the bone and skinned the bone. It was very painful. When Mitchell notified us of the approaching train I looked up, and it was about 100 yards south of the depot and coming fast; I don't know how fast. We were a little north of the depot. I was earning a dollar a day. Did not work any for about six months; tried to work in Chattanooga, but my side hurt me and I had to stop. Never worked for defendant any more after my hurt. Was treated by Dr. Bazemore over two months before he quit. Paid five or six dollars for medicine. All I did when I went back to the service of the company was to carry water. The depot is about 200

feet long. The injury was received in the corporate limits of Ringgold, and there was a street crossing about 25 yards above where I was hurt, and another just south of the depot. No whistle was blown or bell rung by the approaching train. No flagman was sent out in front of our car. *Cross-examination:* Mitchell and Whorly, one of the civil engineers, when they got off both aided in stopping the car. I suppose it ran after they got off about thirty feet. I was not hurt until after they got it stopped and started back. I was not following on behind pushing the car back. Hall, Alexander and Thomas staid on the car and were working the crank going back when Thomas fell over the crank. I was not on the car after it started back. If I had remained on the car I would not have been hurt, but was scared and jumped because Mitchell and the others jumped. Hall and Alexander ran the crank on back. and put it on a side-track. I was on the front part of the car as we came into Ringgold, and jumped off of the front. My eyes were to the south, but I did not see the approaching train until after Mitchell saw it and gave us notice. I did not go back to work for the company in less than three weeks after I was hurt. The doctor never came to see me. I went to see him the next day after I was hurt; walked from my home to town, between one and two miles, and back home. He dressed my leg once every day and sometimes twice; can't say how many times, but I am sure it was over thirty. I did go back before July 18th, with Mitchell, but did not do any work; carried water for the hands, but did not use pick and shovel as the other hands. I complained to the doctor about my side, but he did not look at it. I never asked him to do so. I fell in a hole between the rails.—Dr. Bazemore testified: Plaintiff called at my office July 1, 1892, for treatment. He was hurt on one of the shins; it seemed to be hurt with a rock, was cut

to the bone, and possibly a small portion of the bone scraped off. It seemed more like it had been gouged than cut. It must produce pain, though it was not necessarily so that injury to the bone would cause severe physical pain. It was about well when I last saw it, July 26, 1892. One might receive an injury on the outside of the chest and it might be some days developing, but I don't know that it is probable. I knew nothing of any lung trouble; never noticed him. My charge for treating him was $13, which was reasonable. I examined him five or six times, up to July 26th, when I discharged him, in order to treat his leg. He complained to me of no hurt except on his leg. If he had received immediate serious internal injuries, he might not be able to go to work in three weeks; can't say how long it would take him to do hard work. A severe internal hurt might be overlooked two or three days, and perhaps weeks; but if the formation of an abscess, the patient grows gradually worse until the abscess comes to a head or is absorbed by the system.—Plaintiff introduced a rule directing track and bridge foremen not to run their hand-car around curves or over grades, without sending a man ahead with flag.

Defendant introduced testimony to the following effect: The approaching train was from half a mile to a mile away when Mitchell saw it, gave notice of it and ordered the car stopped. Hall put on the brake, and Whorly and Mitchell jumped off and caught the corners of the car to help stop it, not because alarmed about their safety, the train being so far off that there was no personal danger, but to stop the car and run it back out of the way. Mitchell ordered Green to run ahead with a flag, which he did, to stop the approaching train, and the speed of the train was slackened. The car was stopped in from thirty to sixty feet and started back. Three of the hands were on the car operating the crank,

and plaintiff, who had got off, was walking behind the car pushing; and when they got as far as the culvert he fell in and hurt himself. His getting off the car was without the direction of any one; and if he had staid on it as the other crank hands did, he would not have been hurt. When he was hurt he said his leg hurt him, and never at any time said a word about his side or chest. On July 18th he reported for duty and went to work, doing the same kind of work that he had done before, using pick and shovel, everything the others did. They had started back before the train came in sight, and it was then about half a mile off and running fifteen to twenty miles an hour.

PAYNE & TYE and R. J. & J. McCAMY, for plaintiff in error. W. E. MANN and W. H. PAYNE, *contra*.

LUMPKIN, Justice.

This case turned entirely upon the evidence, a full report of which appears in the official statement made by the reporter. An examination of the plaintiff's evidence, he being the sole witness in his own behalf as to the circumstances under which he was injured, will show that, at best, he made out for himself a very weak and doubtful case. Upon cross-examination, he testified to facts which would absolutely defeat any recovery on his part; and as a whole, his testimony was so utterly inconsistent with itself, and so self-contradictory as to the most vitally important facts in the case, that, in the absence of information from any other source, it would be impossible to ascertain with any degree of satisfaction the real truth as to what occurred. Every witness is under a solemn obligation to tell the truth, the whole truth, and nothing but the truth; and this obligation is especially binding upon one who seeks, by his own testimony, to establish a substantial right against another. *Atlanta Consolidated St. Ry. Co.* v. *Beauchamp*, 93 *Ga.* 6,

19 S. E. Rep. 24.    It surely can never be unfair to a party laboring under no mental infirmity, to deal with his case from the standpoint of his own testimony as a witness.    Where a party calls witnesses who conflict with each other in their sworn statements, he is not to be held responsible for the contradictions among them, for it is not within his power to prevent their occurrence; and a reviewing court will generally give to a party the benefit of the most favorable version of such testimony as a whole which the jury would be authorized to accept.    But a party testifying in his own favor has no right to be intentionally or deliberately self-contradictory; and if he is so, the courts are fully justified in taking against him that version of his testimony which is most unfavorable to him.    Being peculiarly in a position to state fairly and definitely the facts which he professes to know, he is under a duty of so stating them as to give a candid and intelligible account of what occurred.    The courts are also authorized to give great weight to statements unwillingly made upon cross-examination, when these statements have every appearance of being the real truth, though reluctantly told.

It is evident that the plaintiff below did not deal fairly with the court and jury.    He was not candid, and evidently did not wish to disclose all he knew as to the cause of his injury.    On the whole, we think the case should be tried again; and we the more readily reach this conclusion because a complete defense was apparently established by the evidence introduced in behalf of the defendant, if it is entitled to credit.

*Judgment reversed.*