WILSON, RESPONDENT, *v.* BLAIR, APPELLANT.

(No. 4,873.)

(Submitted September 26, 1922. Decided November 22, 1922.)

[211 Pac. 289.]

*Physicians and Surgeons—Contracts—Guaranteeing Success of Operation — Want of Consideration — Trial — Instructions Law of Case—Witnesses Self-contradictory—Effect on Case.*

Trial—Instruction Given Without Objection—Law of Case.
1. Instructions given the jury without objection become the law of the case.

Physicians and Surgeons—Not Guarantors of Successful Surgical Operation.
2. A surgeon agreeing to perform an operation is not a guarantor of a successful outcome, the law requiring of him no more than that he possess the skill and learning possessed by the average member of the medical profession in good standing in the community in which he resides, and to apply that skill and learning with ordinary and reasonable care.

Contracts—Present or Future Consideration Essential.
3. A consideration, present or future, but not past, is essential to the enforcement of a simple contract.

Same—Special Contract of Surgeon Warranting Operation—Want of Consideration.
4. Where a surgeon, after agreeing to perform an operation for a stated amount, was sought to be held under an alleged special contract subsequently made to the effect that he would guarantee that as a result of the operation plaintiff's hand on which it was to be performed would ·be rendered 100 per cent efficient, the alleged special contract *held* void for want of consideration, the past consideration for the operation not covering the subsequent contract of warranty. (MR. JUSTICE FARR dissenting.)

Trial—Witnesses—Party Giving Self-contradictory Testimony—Effect on Case.
5. Where a party testifying in his own behalf is deliberately self-contradictory, the court is justified in judging his case from that version of his testimony which is least favorable to him.

Same—Defendant Protected by Bond—Improper Conduct of Counsel for Plaintiff.
6. The conduct of counsel for plaintiff in bringing to the attention of the jury by questions and argument matter tending to show that defendant surgeon would not himself have to pay any damages that might be awarded, since he was protected by a bonding company, *held,* not commendable.

2. Degree of care and skill required of physicians and surgeons, see notes in 1 Ann. Cas. 306; 14 Ann. Cas. 605; 37 L. R. A. 830.

*Appeals from District Court, Gallatin County; B. B. Law, Judge.*

ACTION by Ralph W. Wilson against J. F. Blair. From the judgment for plaintiff and from an order overruling defendant's motion for a new trial, the defendant appeals. Reversed and remanded, with directions to enter judgment for defendant.

*Mr. W. S. Hartman,* for Appellant, submitted a brief and one in reply to that of Respondent, and argued the cause orally.

The misconduct of plaintiff's counsel in again and again, during the course of the trial, calling the jury's attention to the alleged fact that the defendant was insured in an insurance company (the Medical Protective Association) against loss and damage to himself by reason of the successful prosecution of such claims as those of plaintiff against him, and the failure of the court to exercise the duty devolving upon it of promptly rebuking plaintiff's counsel upon his first reference to this fact, and his failure to instruct the jury not to consider the statement or the remarks of counsel, was such misconduct of counsel and abuse of the discretion of the court as prevented the defendant from having a fair trial of the case within the meaning of subdivision 1 of section 6794 of the Codes. That the error, if it was the only one committed on the trial, requires the reversal of the case is clear from the authorities, and the assignments of error with reference to them are well taken. (*Kerr* v. *National Fulton Brass Mfg. Co.,* 155 Mich. 191, 118 N. W. 925; *Iverson* v. *McDonnell,* 36 Wash. 73, 78 Pac. 202; *Stratton* v. *Nichols Lmbr. Co.,* 39 Wash. 323, 109 Am. St. Rep. 881, 81 Pac. 831; *Westby* v. *Washington B. & L. Mfg. Co.,* 40 Wash. 289, 82 Pac. 271; *Chybrowski* v. *Bucyrus Co.,* 127 Wis. 332, 7 L. R. A. (n. s.) 357, 106 N. W. 873; *Cosselman* v. *Dumfee,* 172 N. Y. 507, 65 N. E. 494; *Tremblay* v. *Harnden,* 162 Mass. 383, 38 N. E. 972.)

*Messrs. Miller, O'Connor & Miller,* for Respondent, sub-
mitted a brief; *Mr. James F. O'Connor* argued the cause
orally.

Misconduct of counsel may be presented to this court only
upon affidavits or upon a bill of exceptions properly certi-
fied to.   To obtain a review of counsel's conduct, there must
be an objection made to the argument at the time and an
adverse ruling and an exception taken; there being no rul-
ing, the matter is not presented to this court as a bill of
exceptions because there is nothing to except to. (*Fitzgerald
v. Fitzgerald,* 16 Neb. 413, 20 N. W. 269; *Kansas City* v.
*McDonald,* 60 Kan. 481, 45 L. R. A. 429, 57 Pac. 123; *Pike
v. Chicago,* 155 Ill. 656, 40 N. E. 567; *Gran* v. *Houston,* 45
Neb. 813, 64 N. W. 245; *Bradshaw* v. *State,* 17 Neb. 147,
22 N. W. 361; *State* v. *Gay,* 18 Mont. 52, 44 Pac. 411;
*Littrell* v. *Wilcox,* 11 Mont. 77, 27 Pac. 394.)

MR. COMMISSIONER LEIPER prepared the opinion for
the court.

Plaintiff's (respondent herein) second amended complaint
sets forth two causes of action.   Prior to the selection of the
jury, counsel for defendant (appellant herein) moved the
court that the plaintiff be required to elect upon which of the
causes of action plaintiff would rely.   This motion was
granted, and plaintiff elected to stand upon the second cause
of action.   It is alleged therein that the defendant is a
physician and surgeon, duly licensed to practice as such and
practicing at Bozeman, Montana; that the plaintiff is a
jeweler, skilled in repairing watches, doing engraving work
and manufacturing jewelry; that in June, 1919, plaintiff
sustained an injury to the thumb of his left hand, which
rendered the first joint thereof stiff; that thereafter plaintiff
consulted with defendant concerning such injury, and for a
valuable consideration to be paid defendant by plaintiff, de-
fendant agreed to perform a surgical operation upon the
said thumb and guaranteed that after such operation plain-

tiff's said hand would be 100 per cent efficient; that such operation was performed, which resulted in further injury to the thumb and such injury to the whole hand as that plaintiff is unable to perform his usual work or to follow his vocation. Plaintiff prays damages in the sum of $15,000.

The answer admits that defendant is a physician and surgeon; that plaintiff sustained injury to the thumb of his left hand in June, 1919; admits that defendant was employed to perform a surgical operation on such thumb; that said operation was performed, and denies all of the other material allegations of the complaint.

The cause was tried to a jury. At the conclusion of the testimony for plaintiff, defendant moved for a nonsuit, which motion was denied. Thereafter defendant offered testimony. The jury returned a verdict for the plaintiff in the sum of $5,000, and judgment was entered thereon. Defendant thereafter moved the court for a new trial, which was overruled. These appeals are from the judgment and from the order overruling defendant's motion for a new trial.

Under specifications of error numbered 1, 2, 4 and 5, the contention is made that the evidence is not sufficient to support the verdict; that the court erred in denying defendant's motion for a nonsuit, and in denying defendant's motion for a new trial; and that the verdict of the jury is against the law.

We will consider these four specifications of error together. In this action the plaintiff is relying upon a special contract alleged to have been entered into with defendant. The plaintiff asserts that under the terms of this contract the defendant agreed to perform an operation on plaintiff's left hand and warranted and guaranteed that the said hand would, as a result of such operation, be cured of all defects and made 100 per cent efficient. To prevail the plaintiff must prove that there was an agreement enforceable at law, that defendant violated such agreement, and that damage resulted. It is admitted that an agreement was made to perform an operation and that such operation was performed, but it is

[65 Mont. 155.]

specifically denied that there was any agreement either warranting or guaranteeing the result of such operation.

The jury were instructed, in part, as follows: "The contract to cure counted upon in the complaint is a special contract which, by its terms, devolved upon the defendant a greater liability, responsibility, and duty than that devolved upon him by the law. To render it valid, there must have been a consideration for the contract, and without such consideration it was a mere gratuitous promise, upon which the plaintiff could not recover.

"So if you find from the evidence that after plaintiff and defendant had agreed that defendant should perform the operation in question and what his compensation for the performance of the operation and subsequent treatment should be, defendant without other consideration passing to him, or paid or promised to him, stated that the result of the operation would be to make plaintiff's hand 100 per cent efficient, and that he would so guarantee, or words to that effect, such promise and dependence upon it was without consideration and cannot be enforced here, and your verdict should be for the defendant.

"You are instructed that if you find and believe from the evidence that the plaintiff promised to pay the defendant any sum of money in consideration of the defendant guaranteeing a cure, or a hand that would be 100 per cent efficient as a result of the operation, that such promise to pay is a good and valuable consideration, even though the said promise was not carried out by the plaintiff."

No objection was made to the giving of these instructions, [1] and they became the law of the case. (*Daniels* v. *Granite Bi-Metallic Co.*, 56 Mont. 284, 184 Pac. 836; 14 R. C. L. 822; *Schmidt* v. *Carpenter*, 27 S. D. 412, Ann. Cas. 1913D, 296 and note, 131 N. W. 723.)

In order to clearly understand the nature of the transactions between the plaintiff and defendant, it becomes necessary to recapitulate a part of the testimony had upon the trial hereof. As hereinbefore noted, the defendant offered testi-

[65 Mont. 155.]

mony; but this did not in anywise strengthen the plaintiff's case. The defendant denies emphatically that any agreement was made between plaintiff and defendant, except that defendant was to perform the operation on plaintiff's left hand, and plaintiff was to pay not less than $25 nor more than $50 therefor. The plaintiff himself and one Ginn, who is an uncle of plaintiff, were the only witnesses who gave testimony in plaintiff's behalf. From plaintiff's testimony it appears that he follows the trade or vocation of a watch-maker and engraver; that in the latter part of June, 1919, the plaintiff, while engaged in doing engraving work, sustained an injury to the thumb of his left hand, whereby the tendons thereof were severed, as a result of which the first joint of the thumb became stiff, and the plaintiff was thereby rendered less capable of performing the work required of him in his vocation. It further appears that about six weeks after sustaining this injury, plaintiff met defendant in defendant's garage, where the conversation occurred between plaintiff and defendant out of which the alleged agreement upon which this action is based grew. Plaintiff testified that he showed his thumb to defendant, at the same time telling defendant of the accident which had befallen him, and asked defendant what was wrong with the thumb; that defendant replied that the tendons had been severed; that it could be fixed by a very simple operation, explaining at the same time the general nature of the operation. Plaintiff then suggested that the operation be performed without administering an anesthetic, but defendant advised against the performance of the operation without first administering an anesthetic.

Continuing on direct examination, the plaintiff testified: "I asked him if he was sure that that operation, as he described it to me, would make my hand as good as it ever was. And he said, 'Yes,' he says, 'I'll guarantee that your hand will be in—first he guaranteed it to me three different times. The first guaranty was, 'Yes, I'll guarantee your hand will be a hundred per cent efficient,' and I told him of

course— Q. What did he say when he said he'd guarantee it to be a hundred per cent efficient? A. He said that it would be ·as good as it was before I had the tendon cut. Q. I understand, but what words did he use that led you to believe that he guaranteed it? A. Well, he said those words. Q. Said what words? A. He said, 'I'll guarantee that your hand will be a hundred per cent efficient after the operation.' Q. Following the operation which he proposed? A. Yes, sir. Q. Did you make any promise to the doctor, at the time he said he would guarantee it to be a hundred per cent efficient at the time of the operation, about paying him for such work? A. Well, I inquired how much the charge for that operation would be, and he said he thought it would be about $25. But he said he would state it would be between $25 and $50. That is, outside of the hospital bill. Q. Did you promise to pay that? A. Yes, sir; I did. Q. That is when he guaranteed to make your hand 100 per cent efficient, you promised to pay him whatever his charges were? A. Yes, sir; I did. Q. Now, did you believe that Dr. Blair when he said that he could make your hand a hundred per cent efficient by this operation? A. Yes, sir; I did, or I never would have had the operation. Q. Did you act and rely upon what the doctor said when he said he'd guarantee a cure of the hand by permitting him to operate? A. Yes, sir; I did. Q. Would you have had the operation performed had you not believed, acted, and relied upon what the doctor told you with reference to this operation? A. No, sir; I would not, absolutely not. Q. Well, you told the court and jury a few moments ago that the doctor guaranteed this two or three different times? A. Yes, sir.''

The plaintiff on his direct examination then detailed what was done in performing the operation, its results, and the damage which followed. On cross-examination, the plaintiff testified, in part, as follows: ''I first said something about what it would cost to have the operation. I asked him about how much it would cost me to have it done, and he said that it would cost me about $25. Well, he said he thought it

[65 Mont. 155.]

would cost me between $25 or $50. He said it would not be more than $50. The way he came to say that he would guarantee that my hand, after he got through with it, would be 100 per cent efficient, was I asked him if he was sure that that would make it so it would be as good as it ever was. He said, 'Yes.' He says, 'I will guarantee that your hand will be 100 per cent efficient.' Q. When he was talking about the results of this operation, he did not say that he thought the operation would be satisfactory and would make your hand substantially as good as it was, but he guaranteed that it would be just as good as though the tendon was never cut? A. There wasn't any thinking about it; he guaranteed it absolutely. Q. He positively guaranteed it? A. Yes, sir; absolutely. Q. Did he say to you that he was making that guaranty in consideration of this $25 or $50 you agreed to pay him? A. Well, I—I promised him that I would pay him, and I know, I feel confident, that he believed and knew that I would pay him, or he would not have undertaken to operate on it. Q. You think he would not have guaranteed the results if it had not been for your promise to pay him? A. No, I do not. I do not believe he'd ever touched it. Q. What was there that was said between you that makes you think and say that? A. Well, of course, I really haven't any ground to say that he wouldn't have touched it if I hadn't agreed to pay him. But I already agreed to pay him—(interruption). Q. Well, now, did you agree to pay him before he guaranteed the results or afterwards? A. Well, he guaranteed the results before I ever considered letting him operate on it. Q. He guaranteed the results before you made even any promise to pay him? A. Because I told him beforehand that if it would not make it as good as ever I would not think of letting him touch it at all. Q. And he in response to that, he told you you need not worry; he'd guarantee it would be as good as it ever was? A. Well, he did not word it just that way. Q. Well, just how did he word it then? A. Well, he came out and gave his assurances and guaranteed it three different times, during our speaking. The way he hap-

pened to make the first guaranty was I asked him if he was sure that my hand would be as good as it ever was, or if he would advise me—when he had guaranteed it to me the first time I asked him— Q. What was it that you asked him? A. Why, when I asked him if he was sure that that would be—it would be as good as it ever was after he got through— he says, 'Yes,' he says, 'I will guarantee that your hand will be a hundred per cent efficient.' Those are the very words he used. Q. Now, that was before any arrangements were made at all; that was just a talk; the first proposition was, his first guaranty came that way, before any arrangement had been made—is that right? A. Well, yes. I asked him if I would have it done, if my hand would be as good as it ever was, and that was just the way that came about. Q. And he answered he would guarantee that it would be a hundred per cent efficient? A. He did. In response to that, I asked him how much it would cost me to have it done, and he said it would be from $25 to $50. Q. Now, then, what was said? Go on and tell us what was said after this first guaranty, and that led up to the second one. A. Well, I remember I asked him the second time if he was—well, I asked him if he would feel sure that it would not—I told him that if it would make my hand any worse, I would not have it done. I would not want to have it done at all, because I could work the way it was, and I would not want to get it in a condition where I could not use it and he said— Q. This was after the first guaranty that you told him that? A. Yes, sir. Q. Go on. A. And he went on and said that my hand would be as good as it ever was. Q. Did he say that he'd guarantee it, or did he say that it would be as good as it ever was? A. Well, he said it would be as good as it ever was, which I would think would be as good as a guaranty. Q. He did not use the word 'guaranty' the second time? A. No, he did not. Q. Hold on now, let's not get away from the garage. That third guaranty, I want to know about that. A. I do not know whether I can state right now just the words he used. I know that he gave me the assurance— Q. No, I want to know what was

[65 Mont. 155.]

said on that third guaranty and how it came about; after we have had two, now here comes this third one. A. Which he did. He assured me three times. Q. That is what I want to find out. What did he say the last time? Now, the second guaranty he did not say it was a guaranty; he just simply said it would be as good as it ever was? A. Yes, sir. Q. Now, then, how about this third time; what was the language he used on the third alleged guaranty? A. I really cannot recall what was said the third time.''

At this point in the cross-examination, court adjourned for the day, and upon the reconvening of court on the morning of the following day the plaintiff, on cross-examination, testified further: ''Q. I'm asking you if you can give us the language of the third guaranty. A. Well, having thought the matter over, Dr. Blair made his guaranty—after my first conversation, after I had agreed to pay him either the $25 or $50, how much it—what his fee would amount to—he guaranteed that my hand would be 100 per cent efficient. Q. Will you kindly give us the language that Dr. Blair used and the circumstances under which he used it at the making of the third guaranty. Yesterday you gave us the language and facts with reference to the first and second; now, please give us the language and circumstances surrounding the third guaranty. A. Well, I wish to state that I admit you kind of got me mixed up yesterday, and the only guaranty Dr. Blair made was after I had agreed to pay him; then he guaranteed that my hand would be a hundred per cent efficient after he'd performed the operation. Q. Now, having thought it over and found out where you're at, what was the language and circumstances of this guaranty that you're telling us about now? A. When I showed him my hand and described the nature of my case and I had asked him whether it could be fixed or not, he said it would be a very simple operation. Then I asked him how much it would cost to have it done, and he told me that it would be $25, but he was sure it would not be more than $50, and so I agreed to pay him that bill. Then I asked him if he was sure it would make

[65 Mont. 155.]

it all right. He says, 'Yes, I'll guarantee that your hand will be 100 per cent efficient after the operation.' That is the identical words he used. Q. That is the way it happened now? A. Exactly; yes, sir. Q. So after the price was agreed upon, then you inquired whether or not the operation would be successful? A. Well, not exactly—yes, it would amount to that. Q. He said it would cure all defects, did he? A. He said my hand would be 100 per cent efficient; those are the words used. Q. Now, I am asking you whether Dr. Blair used that language at the time he made this contract. A. Well after he had made the guaranty and we had talked—we talked quite a little while there before I left. Q. Now could not you answer that question, whether—I asked you whether Dr. Blair used that particular language at the time he made this contract? A. To be frank about it, I do not—I would not say positively just what he did say, or just whether he used those very words or not. But he made the affirmative several times that my hand would be as good as it ever was. Q. Well, I say this guaranty that you've been talking about, that Dr. Blair made, is made up of the construction which you put upon the things that Dr. Blair said? A. No, sir; he come right out and said, 'I'll guarantee that your hand—after I'd promised to pay the amount, he come out and said that 'I'll guarantee your hand will be a hundred per cent efficient.' Q. Did he make that promise because you had promised to pay him $25 for the operation? A. I imagine he did. He didn't make that guaranty until after I'd promised to pay. Q. He did not make the guaranty until after you'd promised to pay? A. No, sir. Q. Now, this from $25 to $50 that you were to pay him was for the operation that he was to perform? A. Entirely; yes, sir. Q. Entirely so? A. Yes, sir. Q. And what were you to pay for the guaranty? A. Well, he came out and voluntarily made that guaranty after I'd promised to pay him the money. Q. He made the guaranty voluntarily? A. Yes, sir; he did. Q. You were not agreeing to pay anything for that? A. No; no, I did not. Q. I say, you were not to pay anything for it? A. I was

[65 Mont. 155.]

paying for the operation. Q. Yes, you yere paying for the operation. A. Yes, and after I'd promised to pay him, he guaranteed the operation, so of course I imagine his guaranty would work in.''

There is other testimony by the plaintiff, but the foregoing is substantially all of plaintiff's testimony which bears upon this phase of the matter. Witness Ginn testified: That he was present at the time of the conversation covered by plaintiff's testimony; that the defendant said that it was a simple operation; that Mr. Wilson asked him when he showed him this, and asked him about operating on it, and he asked him about what an operation like that would cost, and he said from $25 to $50. Then Mr. Wilson asked him if he thought he could guarantee him a good job, a hundred per cent job. He said, ''Yes, you can use it just the same as you did before it was hurt,'' after this cord was sewed up. ''Q. Now, will you answer the question, Mr. Ginn: Did the doctor at that time say anything else about guaranteeing a hundred per cent efficient hand? A. Why, after Mr. Wilson told him about when he'd pay him, he told him he'd guarantee him a hundred per cent job of it. Then Wilson asked what it would cost, and the doctor said it would cost him from $25 to $50, which would cover his fees for the operation. For all I knew, Dr. Blair only agreed that the $25 or $50 was to be for operating on his hand—putting it so that he could use it again. Q. Was it your understanding that Dr. Blair was to be paid from $25 to $50 for all the services he was to perform? A. To put the thumb in perfect shape. Q. Did you hear Dr. Blair use the word 'guaranty' in connection with perfecting a cure? A. Yes, sir; he guaranteed a first-class job. Q. You heard that word used by the doctor? A. Yes, sir. Q. What was the language that the doctor used, just what was said, and how did he happen to say it? A. What? Q. You say he guaranteed it to be a first-class job; what was the language he used? A. What was the language? Q. Yes, what did Dr. Blair say, and how did he happen to say it from which you say he guaranteed it to be a first-class job?

A. When he asked him about the $25 or $50, Ralph wanted to know if he could do him a hundred per cent job, and the doctor said he could; a very simple operation.''

The question presented is: Was there an agreement between [2] plaintiff and defendant, enforceable at law, by which the latter guaranteed and warranted that as a result of such operation the plaintiff's hand would be cured of all defects and rendered 100 per cent efficient? If the contract in question was merely that. defendant was to perform a surgical operation, then the law requires that defendant possess the skill and learning which are possessed by the average member of the medical profession in good standing in the community in which he resides, and to apply that skill and learning with ordinary and reasonable care. He does not become a guarantor of the results of such operation. (*Loudon* v. *Scott,* 58 Mont. 645, 12 A. L. R. 1487, 194 Pac. 488; *Hansen* v. *Pock,* 57 Mont. 51, 187 Pac. 282; *MacKenzie* v. *Carman,* 103 App. Div. 246, 92 N. Y. Supp. 1063.)

It is plaintiff's contention, however, that the defendant [3, 4] entered into a special contract with plaintiff, under the terms of which the defendant increased his responsibility by guaranteeing the results of the operation to be performed. In order that such special contract be valid, or to make it enforceable at law, it must be supported by a consideration. ''The rule that consideration is essential to the enforcement of a simple contract is so thoroughly settled that it may be regarded as one of the elementary principles of the law of contracts.'' (6 R. C. L. 650.) The trial court very aptly stated this rule in the instructions given to the jury and hereinbefore noted. Our statute defines ''consideration'' as follows: ''Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.'' (Sec. 7503, Rev. Codes 1921.) The consideration must be either

[65 Mont. 155.]

present or future, but it must not be past. "The rule that a past consideration will not support a subsequent promise is only another mode of saying that every promise, whether express or implied, must, in order to be binding, be made in contemplation of a present or future benefit to the promisor." (Anson on Contracts, 115; 9 Cyc. 358; 13 C. J. 359.)

The record discloses that upon the day of the trial of this cause, plaintiff on direct examination testified that defendant had guaranteed the results of this operation three different times. Upon cross-examination on the same day, the plaintiff stated the language used by the defendant in the first and second guaranties, and was asked by defendant's counsel the language used by the defendant in making the third guaranty, but stated that he could not recall it at that time. At this point in the cross-examination, the court recessed for the day. Upon court reconvening on the following day, the second question asked the plaintiff was, "I am asking you if you can give us the language of the third guaranty?" to which the plaintiff made answer: "Well, having thought the matter over, Dr. Blair made his guaranty—after my first conversation, after I had agreed to pay him either the $25 or $50, how much it—what his fee would amount to—he guaranteed that my hand would be 100 per cent efficient."

The third question asked was: "Will you kindly give us the language that Dr. Blair used and the circumstances under which he used it at the making of the third guaranty? Yesterday you gave us the language and facts with reference to the first and second; now, please give us the language and circumstances surrounding the third guaranty," to which plaintiff replied: "Well, I wish to state that I admit you kind of got me mixed up yesterday, and the only guaranty Dr. Blair made was after I had agreed to pay him; then he guaranteed that my hand would be a hundred per cent efficient after he'd performed the operation."

The next question asked was, "Now, having thought it over and found out where you're at, what was the language and circumstances of this guaranty that you're telling us

[65 Mont. 155.]

about now?'' to which reply was made: ''When I showed him my hand and described the nature of my case and I had asked him whether it could be fixed or not, he said it would be a very simple operation. Then I asked him how much it would cost to have it done, and he told me that it would be $25, he didn't think it would be more than $25, but he was sure it would not be more than $50. He said it would be between those two fees, outside of the hospital bill, and so I agreed to pay him that bill, which was satisfactory, and he agreed to wait thirty days or a little longer, if necessary. It was perfectly agreeable to him. Then I asked him if he was sure it would make it all right. He says, 'Yes, I'll guarantee that your hand will be 100 per cent efficient after the operation.' '' The question and answer following this is: ''Q. That is the way it happened now? A. Exactly; yes, .sir.''

Immediately following this testimony, the plaintiff, at least eight different times, stated positively that the guaranty was given after he had promised to pay for the operation.

It is argued by plaintiff's counsel that the plaintiff became confused and was misled by the cross-examiner. A careful examination of the record does not warrant this conclusion. This testimony was given after mature deliberation. The record is replete with instances which do not have a tendency to substantiate the contention of plaintiff's counsel that plaintiff was misled, but rather the contrary is true. There is no other testimony which aids that of the plaintiff in this particular. What, then, was the consideration for the guaranty? What was the benefit to be received by the defendant for the warranty? The only consideration or benefit for this whole transaction, passing from plaintiff to defendant, was the fee of from $25 to $50, and plaintiff says that this fee was for the operation. He says that he agreed to pay this to defendant, and afterwards defendant warranted or guaranteed the results of the operation. That which defendant agreed to do, in consideration of the promise to pay $25 to $50, was to perform the operation, and the thing that plaintiff

agreed to do was to pay defendant not less than $25 nor more than $50. Afterwards, plaintiff says the guaranty was made. Neither can it be maintained that the guaranty was made as an inducement to the contract to operate, for the guaranty was made subsequent to the agreement to pay for the [5] operation. What is said by this court, speaking through Mr. Justice Holloway in the case of *Casey* v. *Northern Pacific Ry. Co.*, 60 Mont. 56, 198 Pac. 141, is applicable here, as follows: "It cannot be unfair to this plaintiff to deal with his case from the standpoint of his own statements. A party testifying in his own behalf has no right to be deliberately self-contradictory, and whenever he is so the courts are justified in judging his case from that version of his testimony which is least favorable to him."

Again it is said: "It surely can never be unfair to a party laboring under no mental infirmity to deal with his case from the standpoint of his own testimony as a witness. Where a party calls witnesses who conflict with each other in their sworn statements, he is not to be held responsible for the contradictions among them, for it is not within his power to prevent their occurrence; and a reviewing court will generally give to a party the benefit of the most favorable version of such testimony as a whole which the jury would be authorized to accept. But a party testifying in his own favor has no right to be intentionally or deliberately self-contradictory; and, if he is so, the courts are fully justified in taking against him that version of his testimony which is most unfavorable to him. Being peculiarly in a position to state fairly and definitely the facts which he professes to know, he is under a duty of so stating them as to give a candid and intelligible account of what occurred. The courts are also authorized to give great weight to statements unwillingly made upon cross-examination, when these statements have every appearance of being the real truth, though reluctantly told." (*Western & A. R. Co.* v. *Evans*, 96 Ga. 481, 23 S. E. 494.)

The supreme court of Georgia says: "If a person testify in his own behalf, and there are material conflicts and contradictions in his testimony, he is not entitled to recover if he be the plaintiff, unless that portion of his testimony which is least favorable to his contention is of such a character as to authorize a recovery in his behalf. The rule just referred to was first laid down in the case of *Western & Atlantic R. Co.* v. *Evans,* 96 Ga. 481, 23 S. E. 494. It was recognized and approved in *Freyermuth* v. *Railroad Co.,* 107 Ga. 32, 32 S. E. 668, and *Southern Bank* v. *Goette,* 108 Ga. 796 (2), 33 S. E. 974." (*Atlanta Ry. & Power Co.* v. *Owens,* 119 Ga. 833, 47 S. E. 213.)

From the foregoing it is apparent that the warranty was **[6]** made after the agreement to operate and to pay therefor, that the warranty did not become a part of the contract to operate, and that there was no consideration for the warranty. We are of the opinion that the trial court erred in denying defendant's motion for a nonsuit, that the verdict is against the law, and that the motion for a new trial ought to have been granted.

Error is predicated upon the action of counsel for plaintiff by reason of the following occurrences at the trial below, *viz.*:

(a) Before the impaneling of the jury to try this cause, but in the presence of the jury composed of the whole panel, defendant moved the court for an order requiring the plaintiff to elect whether he would proceed to trial upon his action for damages *ex delicto,* as stated in the first cause of action, or upon his action *ex contractu,* as set forth in the second cause of action. During the argument of this motion, and in the presence of the whole jury panel, counsel for plaintiff said, in part: "May it please the court, we realize, of course, that several demurrers have been filed in this action, but bonding companies defending physicians usually take advantage of everything that they can possibly take advantage of to—" Objection to this statement was made, but the

court made no ruling. The motion requiring plaintiff to elect was granted.

(b) In the course of the cross-examination of the defendant, counsel for plaintiff asked defendant the following questions: (1) "Are you, or is the Medical Protective Association, the defendant in this case?" (2) "Under your contract with them, would you personally, or would they have to, pay any judgment secured against you?" Objection was made and sustained to both of these questions. Counsel for defendant moved the court to direct counsel for plaintiff to desist from asking further questions of like character, but no such direction was made.

(c) During the argument to the jury, counsel for plaintiff made the following statement: "Of course, he did not care anything about it; it was not any affair of his; he was insured in an insurance company; they had to pay these damages." To these remarks of plaintiff's counsel defendant's counsel duly excepted and requested the court to instruct the jury to disregard the same in its deliberations. The court made no response to such request.

The obvious purpose of these statements and questions was to get before the jury such matter as that the jury might infer therefrom that some bonding company, and not the defendant, would be called upon to bear the burden of meeting any judgment rendered in this cause. Clearly none of such matter was admissible and is without the issues. Such practice is not to be commended. Having determined that this cause must be reversed and remanded upon other grounds, we do not deem it necessary to now determine whether or not the action of counsel complained of constitutes, in itself, reversible error.

We recommend that the judgment and order appealed from be reversed and the cause remanded to the district court, with directions to set aside the verdict and judgment for plaintiff, and to enter judgment for defendant.

[65 Mont. 155.]

PER CURIAM: For the reasons given in the foregoing opinion, the judgment and order appealed from are reversed and the cause is remanded to the district court, with directions to set aside the verdict and judgment for plaintiff, and to enter judgment for the defendant.

*Reversed.*

MR. JUSTICE FARR: I dissent. I believe that the judgment and the order appealed from should be reversed and the cause remanded for a new trial, but not for the reasons assigned by Commissioner LEIPER.

In my opinion the conduct of counsel for the plaintiff in introducing before the jury that which was not at all pertinent to the issues involved, the effect of which was well calculated to influence the jury adversely to the defendant, and the failure of the court, when requested by the defendant, to instruct the jury to disregard a remark made by counsel for the plaintiff in his argument, all constituted error requiring that the case be remanded for a new trial. (*Kerr* v. *National Fulton Brass Mfg. Co.,* 155 Mich. 191, 118 N. W. 925; *Iverson* v. *McDonnell,* 36 Wash. 73, 78 Pac. 202; *Stratton* v. *Nichols Lumber Co.,* 39 Wash. 323, 109 Am. St. Rep. 881, 81 Pac. 831; *Lowsit* v. *Seattle Lumber Co.,* 38 Wash. 290, 80 Pac. 431; *Westby* v. *Washington B. L. & Mfg. Co.,* 40 Wash. 289, 82 Pac. 271; *Chybowski* v. *Bucyrus Co.,* 127 Wis. 332, 7 L. R. A. (n. s.) 357, 360, 106 N. W. 833; *Gosselman* v. *Dumfee,* 172 N. Y. 507, 65 N. E. 494; *Tremblay* v. *Harnden,* 162 Mass. 383, 38 N. E. 972.)

As to the basic question, whether or not there was a contract of guaranty separate and distinct from the contract for the performance of the operation and promise to pay therefor, I cannot agree with the conclusion reached by Commissioner LEIPER. I would not burden the record with my views on the question if the case were remanded for a new trial. By the recommendation of the supreme court commission, based upon his opinion, and approved by the other justices, the

[65 Mont. 155.]

district court is to enter judgment for the defendant. The plaintiff being thereby deprived of an opportunity of having his case again presented is my reason for giving expression of my views.

I think too narrow a construction has been given to plaintiff's testimony. The jury was fully instructed as to the law, and under the instructions the jury could have, in my opinion, found for either party according to their judgment of the evidence and of the conclusions to be drawn therefrom. The jury was first told, in effect—upon the plaintiff's theory— that if it found from the evidence that the defendant, for a valuable consideration, agreed to effect a complete cure of plaintiff's hand or to make it 100 per cent efficient by performing a certain operation, and that he failed to carry out his contract, it should find for the plaintiff. (Instructions Nos. 1, 3 and 12.) And, second—upon the defendant's theory—that if it found from the evidence that after the plaintiff and defendant had agreed that the defendant should perform the operation in question and what his compensation for the performance of the operation and subsequent treatment should be, defendant, without other consideration passing to him or paid or promised to him, stated that the result of the operation would be to make plaintiff's hand 100 per cent efficient, and that he would so guarantee, or words to that effect, such promise and dependence upon it were without consideration and could not be enforced and verdict should be for the defendant. (Instruction No. 6.) That these instructions fairly and satisfactorily stated the different theories upon which the case was tried by the respective parties is evidenced by the fact that no exception was taken to any instruction given and no error is assigned to the refusal to instruct.

The evidence has been fairly stated by Commissioner LEIPER, but I do not think it can be said that no other conclusion can be drawn therefrom than that the guaranty testified to by plaintiff was made after the agreement was entered into for the performance of the operation on the plaintiff's hand by the defendant for an agreed compensation. The

[65 Mont. 155.]

evidence is such, in my opinion, that reasonable men might well reach a different conclusion therefrom, and that the conclusion reached by the jury that the agreement to perform the operation, the guaranty, and the compensation agreed to be paid, were all one and the same transaction, was amply justified. The jury had the advantage this court does not have, of seeing and observing the witness and his demeanor and manner of testifying, which advantage the judge of the district court likewise possessed, and he has approved the jury's finding in this respect. Indeed, it is my opinion that such a conclusion is the only natural and logical one that could be drawn from the facts testified to and from the surrounding circumstances; but whether this is so or not, it was certainly within the province of the jury to say what conclusion should be drawn where different minds might reasonably differ. The effect and value is exclusively for the jury (*Lizott* v. *Big Blackfoot Milling Co.,* 48 Mont. 171, 136 Pac. 46), unless it can be said that the evidence taken as a whole furnishes the basis for but one reasonable conclusion (*Old Kentucky Distillery* v. *Stromberg-Mullins Co.,* 54 Mont. 285, 169 Pac. 734; *Milwaukee Land Co.* v. *Ruesink,* 50 Mont. 489, 148 Pac. 396).

Whether the defendant did make any guaranty at all, as testified to by plaintiff and denied by defendant, was of course, the first question for the jury's determination. The doctor claimed that he had not made any contract of guaranty at all—not that there was a contract of guaranty which was without consideration. The jury found this issue for the plaintiff. After the jury had resolved that issue in favor of the plaintiff, the next inquiry was whether the guaranty was made contemporaneously with the agreement to perform the operation for a consideration and as a part thereof, or afterwards and as a separate transaction. This issue was also resolved favorably to plaintiff. The jury having concluded from the evidence that the defendant did guarantee the cure, its finding that that guaranty was a part of the contract for the performance of the operation for an agreed consideration was a logical one.

It was all one transaction; one conversation had at one place, at one time. There were not, as might be assumed from the questions so skillfully propounded on plaintiff's cross-examination, several distinct conversations and guaranties. When the plaintiff said that the defendant guaranteed three different times, or made three different guaranties, that his hand would be as good as ever or 100 per cent efficient, he referred to the different statements made during the one conversation. The repetition by the defendant of the guaranty to plaintiff three different times, in three different ways, during the one conversation, did not make a new guaranty each time the promise was restated. All that was said was said in the course of making the bargain or contract for the operation.

It seems to me that in the very nature of things, considering the relative positions of the parties and the surrounding circumstances, the only natural and logical conclusion from the facts is that found by the jury. What was said between the plaintiff and the defendant respecting the guaranty was not unusual, if the language employed had been used as applied to some different transaction; for instance, if like words respecting a guaranty had been used in connection with the repair of an article of personal property. If a person were taking an article of personal property into a repair-shop, as; for instance, a watch into a jewelry-store to be repaired, and the customer would hand the watch to the jeweler with the inquiry, "Can it be repaired?" and should receive the reply that it could, and then an inquiry were made as to the cost, and the price stated for which the work could be done, and then the price agreed to, thereupon, if the customer did not conclude or agree to have the work done except on a guaranty or promise on the part of the jeweler that the watch would be as good as it was before its injury or 100 per cent efficient, the guaranty or promise became, in my opinion, a part of the original contract. In other words, the real question of fact for determination in this case was whether or not plaintiff did agree to have the operation performed without regard to and independent of the guaranty.

[65 Mont. 155.]

The plaintiff in the course of his testimony made many statements clearly indicating that he would not have had the operation performed had it not been for the promise or guaranty made by the defendant to the effect that his hand would be as good as ever. For instance, the question was asked him, and it was the last question on this subject propounded to him on cross-examination: "Well, now, did you agree to pay him before he guaranteed the results or afterwards? A. Well, he guaranteed the results before I ever considered letting him operate on it. Q. After you had agreed about what the operation should cost and you promised to pay him for the operation what you had agreed on it should cost, and in addition to that and voluntarily he agreed that the operation would make your hand 100 per cent efficient? A. Yes, sir; or I never would have let him go ahead." Plaintiff was corroborated by his uncle, who was doing the repair work on Dr. Blair's car at the time, and who testified: "Mr. Wilson asked him when he showed him it and asked him about operating on it, and the simple manner, and he asked him about what an operation like that would cost, and he said from $25 to $50. Then Mr. Wilson asked him if he thought he could guarantee him a good job, a 100 per cent job. He said, 'Yes, you can use it just the same as it was before it was hurt, after this cord was sewed up.' I heard Mr. Wilson offer to pay the $25." After a vigorous and skillful cross-examination, counsel for plaintiff endeavored, on redirect examination, to have the witness explain some of the statements made on cross-examination; but defendant's counsel objected and the court would not permit a further examination, saying that the matter had been thoroughly gone into both on direct and cross.

Plaintiff has used the word "guaranty," or that "he guaranteed," in referring to the respondent's promises or representations to him with respect to a cure; but it would be unfair to say that they were so used in any technical sense. The word "guaranty" is frequently used as equivalent to the word "warrant," and was so used by plaintiff. To be enforceable as a contract, the guaranty or warranty must, as the jury was

told, be supported by a consideration. An examination of the decided cases, however, will disclose that where the warranty was made in the course of making the bargain or contract, and even though collateral thereto, a consideration therefor is supported by the price paid or agreed to be paid for the thing which was the subject of the contract—in this instance, the performance of the operation. In fact, I have been unable to find a case where the statements or representations which it is alleged constituted the warranty were made at the time of the transaction or bargain, and before the contract was performed, were not held to be supported, as to consideration, by the price paid or agreed to be paid.

That the guaranty may have been collateral to the contract for the performance of the operation for a consideration would not in itself invalidate it. Even though collateral, if a part of the transaction or contract, no separate consideration was necessary. It is not necessary that representations, in order to constitute a warranty, should be simultaneous with the conclusion of the bargain, but only that they should be made during the course of the negotiations that lead to the bargain and should then enter into the bargain as a part of it. (24 R. C. L., subject "Sales," sec. 426; *Morris* v. *Fertilizer Co.*, 64 Fed. 55, 12 C. C. A. 34; *Standard Underground Cable Co.* v. *Denver Con. Electric Co.*, 76 Fed. 422, 22 C. C. A. 258.) "It is not, indeed, necessary that the representation, in order to constitute a warranty, should be simultaneous with the conclusion of the bargain, but only that it should be made during the course of the dealing which leads to the bargain, and should then enter into the bargain as part of it." (Benjamin on Sales, p. 808.) "It will be sufficient, and the warranty will constitute a part of the sale, when, but only when, it is made at some time during the negotiations—after the treaty has been begun and before it is finally concluded." (Mechem on Sales, sec. 1248.)

In the matter of the sale of personal property, the fact that the terms of the sale had been agreed upon and a part payment made will not render unenforceable a subsequent war-

ranty made at the time the balance is paid and the chattel delivered, upon the theory that such a contract is not complete until the delivery and payment of the balance of the purchase price. (24 R. C. L., "Sales," sec. 426; 35 Cyc. 372; *Douglass & Hemingway* v. *Moses,* 89 Iowa, 40, 48 Am. St. Rep. 353, 56 N. W. 271; *Vincent* v. *Leland,* 100 Mass. 432; *Spalding* v. *Conant,* 146 Mass. 292, 15 N. E. 638.)

By the same parity and force of reasoning it would seem that any representations that were made by the defendant doctor to the plaintiff, in the nature of or constituting a warranty as to the results to be obtained prior to the completion of the contract, would be supported by the original consideration. Here the contract was not performed until the performance of the operation and the payment of the price. But it is not necessary in the instant case to go so far as this. Here the warranty, according to the jury's finding implied by its verdict, was made at the time of the agreement for the performance of the operation.

As I understand the court's instruction No. 6, there is not anything therein not in harmony with the general principles of law herein expressed. Before the jury could have given any consideration to the principle of law stated in that instruction to the effect that there must have been a consideration for the contract of guaranty, and that without such consideration it was a mere gratuitous promise upon which the plaintiff could not recover, it must have found the guaranty or warranty was made "after plaintiff and defendant had agreed that defendant should perform the operation, and what his compensation for the performance of the operation and subsequent treatment should be." It did not so find. It found, upon plaintiff's theory as stated in instructions 1, 3 and 12, to the effect that the defendant for a consideration agreed to effect a complete cure; in other words, that the contract to perform the operation and the warranty was all one and the same transaction and was supported by the same consideration—the only logical conclusion, in my opinion, that could be drawn from the testimony.

Even under the conclusion which has been drawn from the evidence by the opinion of Commissioner LEIPER, I do not think that the case should be dismissed. In view of the restriction of the redirect examination by the trial court, after the vigorous cross-examination of the plaintiff on the matters relating to the guaranty, I do not think it can be said that the ·plaintiff has had such a full opportunity to present his case that the court is justified in directing the district court to enter a judgment for the defendant.