MINNEAPOLIS–MOLINE POWER IMPLEMENT CO., AP-PELLANT, *v.* PARENT, RESPONDENT.

(No. 6,972.)

(Submitted November 28, 1932. Decided December 29, 1932.)

[17 Pac. (2d) 1088.]

208

*Mr. Paul Babcock* and *Messrs. McIntyre & Burtness,* of the Bar of Grand Forks, North Dakota, of Counsel, for Appellant, submitted an original and a reply brief; *Mr. W. A. McIntyre* argued the cause orally.

*Mr. Howard M. Lewis* and *Mr. John S. Nyquist,* for Respondent, submitted an original and a supplemental brief; *Mr. Lewis* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by the plaintiff to recover the balance due on five promissory notes aggregating approximately $3,000, together with interest, attorney's fees and costs. Three of the notes were executed and delivered by the defendant to the plaintiff as payee, on July 30, 1929, and two of them, in favor of the Minneapolis Threshing Machine Company as payee, dated October 15, 1925, aggregating $987, which were duly indorsed to the plaintiff. By answer the defendant admits the execution and delivery of the notes, but seeks to avoid payment upon grounds of breach of warranty, fraud and misrepresentation in connection with the sale of a certain Model "C" Minneapolis Steel Combine with motor, grain tank, straw spreader, and attachments; and by way of cross-complaint, denominated a counterclaim, the defendant alleges that as to the three notes executed and delivered by the defendant to the plaintiff, dated July 30, 1929, the defendant should be relieved of their payment by reason of want of consideration and the plaintiff's alleged breach of warranty, fraud and misrepresentation. The defendant alleges that in consequence of such breach of warranty, fraud and misrepresentation he sustained damages amounting to the sum of $11,049, for which he prays judgment. By reply the plaintiff denies all the affirmative allegations of the answer, except as to the purchase of the combine and attachments and the execution and delivery of the notes; it being affirmatively alleged therein that at the time of the purchase and sale of the

combine and accessories the plaintiff and defendant entered into an agreement in writing wherein the plaintiff gave to the defendant a warranty respecting the combine, and no other, which is set forth in full; it being therein further averred that the plaintiff has at all times fully performed each and every part of its warranty agreement, and that the defendant never at any time notified the plaintiff of any defects in the combine as required in the warranty agreement, but on the contrary retained and used the combine and accessories from the time of its purchase on or about July 30, 1929, until on or about December 15, 1930, and thereby waived any right or option which he might otherwise have had under the terms of the written contract by returning the property to the plaintiff and demanding a discharge of the notes by him executed in payment; it being further alleged that on August 14, 1930, by an agreement in writing entered into between the plaintiff and defendant, in consideration of the plaintiff extending the time of payment of all of the notes representing the amount due on the purchase of the combine and accessories, upon which the plaintiff now seeks recovery, the defendant agreed to release the plaintiff from all further liability by reason of its contract of warranty entered into at the time of the purchase and sale. From the pleadings it appears that the combine, attachments and other machinery were mortgaged to the plaintiff by the defendant, and that in the fall of 1930 the plaintiff foreclosed the mortgage and applied the proceeds of the sale on the three notes executed by the defendant in purchase of the property, as shown by indorsements made thereon.

The cause came on regularly for trial before a jury on June 22, 1931, and resulted in a general verdict in favor of the defendant, awarding him as damages the sum of $2,908, upon which judgment was regularly entered. A motion for a new trial was made and by the court denied, and the appeal is from the judgment.

The appellant specifies seventy-two assignments of error as reason for reversal of the judgment, but after carefully reading the record and considering all of them, we are of opinion

that but three questions need be considered by us in disposition of the case, viz.:

1. Was a breach of warranty established by the evidence;
2. What was the effect, if any, of the settlement agreement; and 3. Is there competent proof of damages sustained by the defendant to justify the verdict and judgment?

1. From the evidence it appears that for ten or fifteen years before July 22, 1929, the defendant, a farmer engaged in growing crops on lands located about eleven miles from the town of Medicine Lake had been acquainted with one Carl E. Nelson, the plaintiff's agent at Medicine Lake, and for many years had satisfactory business dealings with him in the purchase of farm machinery and equipment manufactured by the plaintiff and its predecessor, the Minneapolis Threshing Machine Company, which gave him confidence in his business transactions with Nelson. In fact, the first two notes mentioned in the plaintiff's complaint were given to the plaintiff's predecessor in the purchase of machinery and equipment, one being dated at Medicine Lake, October 15, 1928, for the sum of $475, with interest at eight per cent per annum, payable October 1, 1930, and the other being of like date, place of execution, and interest rate, for the sum of $500, payable October 15, 1929, upon which latter note a payment of $50.33 was made on January 24, 1930. The defendant is illiterate, and while he is able to sign his name, he cannot read.

On or about July 22, 1929, the defendant called upon Mr. Nelson at his place of business in Medicine Lake, being then interested in the purchase of a "Minneapolis-Moline Combine." By telephone Mr. Nelson then called and talked with L. F. Vollmer at Wolf Point, the plaintiff's field representative, and immediately thereafter on that day the defendant and Nelson proceeded to Wolf Point, in the defendant's automobile, to confer with Mr. Vollmer, with whom the defendant was also acquainted and reposed confidence, having had business dealings with him for a period of about five years. Upon meeting Mr. Vollmer, the defendant stated to him that he wished to purchase a "16-foot Minneapolis-Moline

combine with 4–foot extension," but Vollmer induced him to order a 20–foot combine, assuring him it would be much better for his purposes. The defendant testified: "I took Mr. Vollmer's word for it and bought the combine. I told him, 'I don't know nothing about combines, as I had no experience with them, you are selling them and around where they work,' and, I says, 'I am just taking your word for it Lou, and if you say the combine is all right, that is the combine I will take.' " He further testified that he told Mr. Nelson and Mr. Vollmer that he was farming 1400 or 1500 acres of land, and Mr. Vollmer stated to him that a 20–foot combine would be really a better combine than a 16–foot combine, that it "was a good combine, as good a combine as there was on the market, the best combine on the market—that it would be the best combine for my business," and that relying upon Vollmer's representations he signed what he terms "an order" handed to him by Vollmer for his signature, although he states that he did not know its contents and that it was not read to him, wherein, among other things, the plaintiff warranted the machinery "to be in good working order at the time of delivery, and will well perform the work for which it is intended if properly used and operated; * * * that in case there should be any real or apparent failure of either of said machines, attachments, articles or component parts thereof, to fulfill the warranties aforesaid, the purchaser shall give written notice of the defect complained of, describing the same and stating when it was discovered, to the Company at its Hopkins, Minn., office, by registered letter posted not more than seven days after such discovery, and in any event not more than ten days after it is first used by the purchaser, and the purchaser shall forthwith discontinue the use thereof, pending the remedying of such defect, and shall allow said company a reasonable time to remedy the defect, if any exists; the purchaser agrees to render friendly assistance to the company and furnish adequate means for operating and testing the machinery, and in case the defect is in the machinery or any of its parts and the same is not remedied, the particular part, machine, attach-

ment or article which fails to conform to the warranties aforesaid must be returned by the purchaser in as good order as when received, except for ordinary wear to the place where it was received, and the purchaser shall thereupon immediately notify the company of such return by registered letter addressed to its said home office, and the company may thereupon at its option either replace the same or it may elect to rescind this contract so far as such machine, attachment or article is concerned, and in case any machine, attachment or article is returned by the purchaser, and not replaced by the company, then the company shall return to the purchaser the moneys, notes and property given therefor or credit on his notes pro rata the agreed price of said machine, attachment or article so returned, and the purchaser shall not have nor make any further or other claim of any nature upon the company, rescission, upon the terms and conditions and to the extent stated, being his sole remedy.

"The continued use or possession of the machine, part or attachment after a period of ten days from the date it is first used or the use and possession thereof after an attempt has been made and completed to remedy defects therein or the failure to give the notices herein required as and within the time required, or to return the machine, part or attachment as herein provided, shall be conclusive evidence that the warranty is fulfilled.

"Second. That all the machinery mentioned is warranted to be well made, of good material and durable with proper care, and the company agrees that if any separate distinct individual parts making up the whole part (except belts, hose, batteries, spark plugs, magnetos, coils, oilers and oilpipes, which are not warranted) proves defective in consequence of a latent defect in the material or workmanship, at any time within six months after the date of delivery of the said machinery, and if such part is within seven months from such date of delivery returned to the company, at its factory or at its nearest branch house, freight prepaid, and if the same is found by the company, or its branch house manager, to be defective, by rea-

son of any such latent defects, it will be replaced free of charge, except for transportation charges. That a defect within the meaning of this warranty in any part of the machine, attachment or article shall not, when such part is capable of being renewed, repaired, or replaced, operate to condemn such machine, attachment or article.''

At the trial plaintiff offered evidence of the execution and delivery of the notes in suit, and that it is now the lawful owner and holder thereof; that no part or portion of the indebtedness represented thereby has been paid, save and except as shown by indorsements made of credits on each of the three notes, dated July 30, 1929, executed to the plaintiff, as follows: On the note for $1,175, the sum of $43.88 paid on interest January 24, 1930, and the sum of $331.12, ''by sale,'' on December 31, 1930; on the note for $900, the sum of $159.65, ''by proceeds of sale,'' December 31, 1930; and on the note for $800, ''the proceeds of C. M. sale,'' December 31, 1930, $800. It thereupon rested its case.

L. F. Vollmer and O. T. Stennes both testified that the company's guaranty was carefully read aloud to the defendant by Vollmer before the defendant signed the contract, although this is denied by the defendant. About two weeks after the order given by the defendant, the combine and other equipment were delivered at Medicine Lake, the defendant paid the freight charges amounting to $125, to plaintiff's agent, Carl E. Nelson, unloaded it and took it to his farm, immediately after which one of the plaintiff's experts or mechanics went to the defendant's farm and helped to set it up. Thereupon the plaintiff's agent, L. F. Vollmer, with whom the defendant had contracted for the machinery, visited the defendant's farm and obtained a settlement with him for the purchase price by receiving from the defendant the three promissory notes, each dated July 30, 1929, above described, secured by a chattel mortgage, upon which notes the plaintiff's third, fourth and fifth causes of action are predicated.

From the time the combine was set up on defendant's farm in the fall of 1929, until it was taken on foreclosure of

mortgage in the month of December, 1930, the defendant attempted to use it in harvesting his crops of grain and flax, parts of it repeatedly broke, and the defendant and his employees and the plaintiff's mechanics were continually working upon it and repairing it in an endeavor to make it work satisfactorily. In the fall of 1929 the defendant had 1400 acres in crop to harvest, and he used the combine in harvesting the crops for a period of 55 days, and worked with it about half of that time in an endeavor to repair it and make it operate, and it never did perform the work as warranted. The plaintiff had its representative on the farm, Henry Heuseman, and another mechanic, for several days in the harvesting season of 1929, endeavoring to fix the combine and make it perform its work. In that season, of his 1400 acres in crop, there were 152 acres in flax, 80 acres of which he combined, resulting in a yield of one and one-half bushels per acre, the remaining 72 acres he cut with binders and threshed with the Minneapolis-Moline separator which he had previously purchased from the plaintiff's predecessor, obtaining thereby a yield of three bushels per acre. The 80 acres of flax were cut on lands belonging to S. C. Faaborg, in which crop the defendant had a one-half interest. The defendant harvested 250 acres of wheat early by the use of binders and a separator, as he wished to have the straw, which yielded 15 bushels to the acre; and about 30 days later the remaining 900 acres of wheat he combined, which yielded about 6½ bushels per acre. As to this acreage he testified: "I was not the owner of all of it; I had 300 acres I had a full interest in, and a full interest in 72 acres of flax. I had 150 acres on Mr. Faaborg's land I had three-fourths interest in, and 145 acres on Mr. Lamere's I had a three-fourths interest in, and the balance was half."

In the year 1930 the defendant had 1700 acres from which to harvest crops. He testified: "I had 272 acres of flax, of which 200 acres was my own, and the balance belonged to Mr. Faaborg. My interest in the 200 acres was undivided. Of the 72 acres of Mr. Faaborg's I was to get three-fourths. I also had 80 acres of oats and the balance wheat. Some of it

was cut with the binders and some with the combine. We had two combines working. We used the Minneapolis the first two or three days in cutting the crop and also used another combine, 'a Rumely,' that belonged to Frank French. The Rumely cut about 140 acres. * * * We cut 100 acres first with both combines in one field, and then we went into a different field, but that one field we cut 100 acres, and the balance of the field was cut with binders. I paid French a dollar an acre for the use of the Rumely combine because the Minneapolis was not ready and the grain was shelling. Used the binders because the combine wasn't ready. I got out and cut what I could with the binders in order to save what I could. I know the condition of the crop in 1930. It was a short crop. It ripened early and ripened fast and it was short." He used the combine in harvesting the crops in 1930 for a period of 37 days, but it was only working about half of the time, although the plaintiff had practically remade it that fall. The rest of the time was consumed by the plaintiff's servants and employees, assisted by the defendant's employees, in an endeavor to fix it up so that it would work. It was constantly breaking parts and causing trouble, and in its operations lost a considerable amount of wheat. When the two combines were used in harvesting the wheat on the 100-acre patch, the yield averaged 14 bushels to the acre. When the Minneapolis combine alone was used the yield of wheat was but 5 bushels to the acre. There were 200 acres cut with a binder and threshed, which yielded 8 bushels to the acre.

As to the condition of the combine when first used on the defendant's farm immediately after its delivery, the defendant testified that with the assistance of the plaintiff's expert, first sent to the defendant's farm, the combine was set up and run for half an hour or thereabouts, when they shut it down because of a "sprung shaft" which runs the full width of the machine. "After the shaft was sprung we had to send to Minot for another one * * * " which delayed them "a couple of days waiting for repairs." In the meantime, while waiting for the arrival of repairs for the combine, he cut some

of his grain by the use of binders. The new shaft was received and was put in place by the plaintiff's representative with the aid of the defendant, after which the combine was taken out into a field and given a try-out in operation. It did not work satisfactorily; it ran sideways rather than straight ahead, and the front wheels skidded all of the time. The defendant further testified: "You had to run your canvasses too tight in order to keep it on there, and your guides, when you run it that tight, your wheels would come along and catch your canvasses and of course, it would tear your canvas and split your reels. And their clutch they have on the reel, with that big, heavy, long reel, would not hold that reel, it slipped, and when you run it so tight it caught anything, it would break, strip your reel. If you didn't run it that tight, a good big wind would stop it from running. Too heavy a reel for the size of the thing. The expert was there when that occurred and he fixed it, tried to fix it up. That was Mr. Heuseman. Heuseman was there off and on all fall. He would be there for two days, sometimes three days, and would be gone about a week or so, two or three days, and come back again. During that time he tried to line up the platform and tried to fix up the reel. The main shaft in the reel broke, truss rod broke, and the whole thing went down in a heap and we fixed it all up and made the truss rods longer and put them out further. Mr. Heuseman and Mr. Lamere did that, under Mr. Heuseman's direction.  *  *  *  "

During the season of 1929 the combine actually worked only half of the time and the other portion of the time they were engaged in an effort to repair it. Mr. Heuseman was there, together with a man from the factory helping Mr. Heuseman, in an endeavor to fix the reels and clutches to make it operate. Mr. Lamere, a handy man about the farm, employed by the defendant, put in new reel arms on the combine while Mr. Heuseman was there, and also a new pitman for driving the sickle. The pitmans kept breaking all the time and Mr. Lamere made some that were strong enough out of ash, which Mr. Heuseman approved, and it functioned as good as any

they had theretofore had. The chains on the combine kept breaking all the time, and the company's mechanic, with the assistance of defendant's employees, repaired them. They broke pretty nearly every day and sometimes two or three times a day. He further testified: "With regard to what I called on the first part of my examination side-draft or sideways pull of the machine, the defect in that regard was mentioned to Mr. Nelson and Mr. Heuseman and all of them. Mr. Vollmer was out there during that time and I made complaint about that to him. I made complaint to all of them and they told me they would fix it up and have men there to fix it up and make it go. I made several reports of this nature to these persons during the harvest season. Vollmer told me in regard to this sideways pull of the machine they would fix it up and would get a man there that would fix it up. They tried to remedy it, tried to fix it, had a man out there. Mr. Heuseman was working on that that year, 1929. Relative to fixing the canvas, Mr. Lamere renewed all them rollers, smaller rollers. They all wore out on the end and they went to pieces. Wore out in no time. They're just a block of wood about that size (indicates). I think Mr. Heuseman was there, or seen the work, but I don't remember whether he helped with some of them.

"There are no guides to the rollers, but there is a guide up above on the platform that elevates up into the machine. These guides wore out in no time and we had to make some. Mr. Heuseman was there when Lamere made them. He made them out of old plow lays, and made them wider and longer and heavier." In his testimony he was corroborated by William Lamere and others.

On or about August 14, 1930, the plaintiff's agent, W. D. Kinsella, called upon the defendant at his farm in an endeavor to collect from the defendant the balance owing to the plaintiff on account, and thereupon entered into a written agreement with him which reads as follows: "For and in consideration of the Minneapolis Moline Power Implement Co. extending my notes as follows Note No. 1191 Dated 7–30–1929 for

$1175.00 Due Demand 1929 to be Extended 1930.—Note No. 1192, Dated 7–30–29. Due 9–1–1930 to be extended to 9–1–1931—Note No. 1193 Dated 7–30–1929 due 9–1–1931 to be extended to 1932 and also in consideration of the Co. furnishing me certain repairs free and doing certain service work on my Combine and Tractor, receipt of which is hereby acknowledged, I hereby in consideration of all of the above, release the Minneapolis Moline Power Implement Co. from further responsibility and agree that this constitutes a full and free release of all warranties or other claim—it is also understood that my notes given for Tractor is also extend one year from due date thereof and that I be furnished a partial release of chattel mortgage releasing Tractor No. Type B 4358 from their security.

"(Signed) WILFRED PARENT.

"Witness W. D. KINSELLA.

"H. C. SWEDBURG."

Save for the execution of the agreement of release of damages and payment made of $43.88 on the $1,175 note dated July 30, 1929, evidencing the original contract, and damages awarded the defendant, the case is not unlike that of *Advance-Rumely T. Co., Inc.*, v. *Wenholtz*, 80 Mont. 82, 256 Pac. 1085, which is controlling as to the breach of warranty.

A recital of all of the facts showing a breach of the warranty and waiver of notice under the terms of the original contract of purchase of the combine and accessories would unnecessarily prolong this opinion. Suffice it to say, they were established by abundant evidence.

It is the contention of plaintiff's learned counsel that the contract for the purchase of the combine and accessories having been reduced to writing may not be varied by parol evidence respecting preliminary negotiations under the provisions of section 10517, Revised Codes, 1921, and the decisions of this court construing the same. Conceding this to be a correct statement of the law, the representations made by the defendant's agents Nelson and Vollmer were nothing more than trade talk, the defendant's written warranty being the con-

tract in truth and in fact breached, as shown by a preponderance of the evidence. So that it is not at all necessary for us to consider, or discuss, the rule applicable to the variation of written instruments by parol evidence. The terms of the written warranty were shown to have been breached, and the plaintiff having had its agents and representatives at work continually in endeavor to make the combine operate satisfactorily without avail, thereby waived the necessity of the defendant giving it notice in writing as required by the plaintiff's written contract of warranty.

2. But what of the defendant's written agreement entered into August 14, 1930, at the defendant's farm whereby he agreed to release the plaintiff from all damages arising out of the contract for the sale of the combine and accessories?

It is noted that this contract was not by the plaintiff pleaded in its original reply to the defendant's cross-complaint. It was apparently an afterthought. At the conclusion of the defendant's testimony at the trial, the plaintiff requested and was granted permission, over objections, to amend its reply by pleading the execution of such agreement. It was then permitted to be introduced in evidence as Exhibit "T," and the jury was instructed with respect thereto without objection. However, it is manifest the plaintiff placed no reliance upon such agreement, as later in December, 1930, it foreclosed the chattel mortgage given as security for the payment of the amount due on the three notes given in purchase of the combine and accessories, the amount received upon such sale being credited on the notes as of date December 31, 1930. Thus it is clear that the plaintiff entirely disregarded such settlement agreement. It cannot be permitted to absolve itself by reason of the provisions of the settlement agreement, in view of the fact that wholly without regard thereto, a little over three months later, it sold the mortgaged property and applied the proceeds on the indebtedness. Moreover, the fact that this agreement was not considered by the plaintiff as binding is conclusively demonstrated by the institution of this action on January 20, 1931, to recover on the notes so attempted to be

extended as to due date, before the maturity provided by the terms of such agreement. It is absurd on its face for the plaintiff to allege such contract of settlement as a defense when it is shown to have thus repudiated it entirely. It was not properly admitted in support of the plaintiff's action.

3. As to the damages sustained by the defendant, without objection, the court instructed the jury as follows: ''If you find for the defendant upon his counterclaim against the plaintiff, the measure of defendant's damages, if you find by a preponderance of the evidence that the defendant has suffered damages, is the amount representing the excess, if any, of the value which the said combine would have had at the time of its purchase, over its actual value at that time, to which must be added a fair compensation for the loss, if any, incurred by the defendant in an effort in good faith to use said combine, not, however, exceeding the sum of $11,049.00, less, however, the amount due the plaintiff upon the said five promissory notes, to-wit: The sum of $947.00 with interest thereon at the rate of eight per cent per annum from October 15, 1928, less the amount of $50.33 with interest thereon from the date the same was paid, to-wit: January 24, 1930, and being the total amounts of the two first promissory notes hereinabove mentioned, plus interest and less the payment (and interest upon said payment), from the date the payment was made; and also the sum of $2875.00 (being the sum total of the notes hereinbefore referred to given for said combine), with interest thereon at the rate of eight per cent per annum from July 30th, 1929, exclusive of the sum of $1290.75, being the total amount paid thereon on December 31, 1930, and the further sum of $43.88 paid thereon on January 24, 1930, and with interest upon the total amount so paid from the date of the payments thereof. In other words, you are to compute the total amount due from the defendant to the plaintiff upon the promissory notes mentioned in plaintiff's complaint, with interest, but deducting from the principal and interest of said notes, the payments made thereon, and in the event your verdict is in favor of the defendant, upon the defendant's

counterclaim, you must deduct from any amount which you may find to be due the defendant from the plaintiff, the amount due on the promissory notes mentioned in plaintiff's complaint.''

And further: ''That, whether defendant may recover damages herein from the plaintiff, upon his counterclaim, among other things, for the alleged wastage of the time of himself and of his threshing crew and employees, in the alleged effort to use or repair the machine in question, and the value of his and their time, together with the alleged cost of the use of his truck and auto, in reasonable effort to remedy these defects, if such existed, and also the amount paid for the hire of another combine, if any were paid, or any other combine were hired, to do the work of combining the crops (if you find from the preponderance of the evidence that these things were done), depends upon the question as to whether or not such damages may fairly be supposed to have been within the contemplation of the parties when they entered into the contract for the purchase of the combine, and whether they were such as might naturally be expected to result from its violation, if such violation occurred, and were proximately caused thereby. All of the alleged items of the damages claimed by the defendant, in his counterclaim herein, are subject to the above rules of law; and all of the above elements must be established by the defendant, by the preponderance of the evidence, before you can find, as to the defendant's damages, upon his said counterclaim, in favor of defendant herein.''

These instructions so given by the court constituted the law of the case (secs. 8679 and 8680, Rev. Codes, 1921; *Daniels* v. *Granite Bi-Metallic C. Min. Co.,* 56 Mont. 284, 184 Pac. 836; *Wilson* v. *Blair,* 65 Mont. 155, 211 Pac. 289, 27 A. L. R. 1235; *First State Bank* v. *Larsen,* 65 Mont. 404, 211 Pac. 214; *Dietz* v. *Rabe,* 65 Mont. 500, 211 Pac. 343; *Harwood* v. *Scott,* 65 Mont. 521, 211 Pac. 316) and are controlling.

There being sufficient evidence upon which to base the amount of the verdict rendered, and the trial court having denied the plaintiff's motion for a new trial, it is not

within the province of this court to interfere. (*Ball* v. *Gussenhoven*, 29 Mont. 321, 74 Pac. 871; *Cohen* v. *Clark*, 44 Mont. 151, 119 Pac. 775.) It is also noteworthy that the plaintiff raises no objection to the amount of the verdict save as incorporated in various assignments of error based upon the admission of certain items of evidence as to the damages sustained by the defendant. We have carefully read and considered the entire record and the plaintiff's alleged errors assigned, and can see no good reason to disturb the judgment, and, accordingly, it will stand affirmed.

MR. CHIEF JUSTICE CALLLAWAY and ASSOCIATE JUSTICES ANGSTMAN, FORD and MATTHEWS concur.

---

### ON MOTION FOR REHEARING.

(Decided January 18, 1933.)

Opinion: PER CURIAM.

On motion for rehearing but one matter is presented which we deem worthy of special comment. The point is made that since in the original contract of purchase it is stipulated, in effect, that, if the machinery was not as warranted, defendant's sole remedy would be a rescission of the contract, he cannot avail himself of any remedy by way of damages. Reliance is had upon the cases of *Rickards* v. *Aultman & Taylor M. Co.*, 64 Mont. 394, 210 Pac. 82, *Advance-Rumely Thresher Co.* v. *Terpening*, 58 Mont. 507, 193 Pac. 752, and *Best Mfg. Co.* v. *Hutton*, 49 Mont. 78, 141 Pac. 653. But none of these cases is in point under the facts shown in the record.

This case was tried upon the question whether there had been a breach of warranty; the defendant asserting that there had been, and the plaintiff denying that issue. This is shown by the pleadings, by the proceedings throughout the trial, and is presented directly by instructions given without objection. The only reason advanced in the trial of the action by the

plaintiff as to why the defendant could not recover damages was that he had waived them by the execution of Exhibit T. But, as we have pointed out in the opinion, that position is untenable.

By reason of the conduct of the parties from the beginning, as well as their attitude throughout the trial, the stipulation respecting the remedy of rescission in the original contract, above alluded to, was waived.

The motion for rehearing is denied.

ASSOCIATE JUSTICES STEWART and ANDERSON, who were not members of the court when this cause was argued and decided, take no part in this decision.