Sullivan, }
Jan. 4, 1927. }

### HENRY HARLOW *v.* MAMIE LECLAIR.

Upon a motion for a nonsuit the plaintiff is entitled to have the case considered upon that interpretation of the evidence which is most favorable to him; but he will be allowed on such motion to take advantage of the contradiction of his own testimony only where the circumstances are consistent with honesty and good faith on his part.

If a party of mature years and unimpaired mentality testifies understandingly and definitely as to matters within his knowledge, he will not be allowed to obtain a judgment based upon a finding that he has perjured himself.

Where any part of the consideration of a contract is an agreement to commit a crime no action can be maintained thereon but the parties will be left *in statu quo.*

ASSUMPSIT, upon the common counts; in addition to which the plaintiff filed the following specification:

### "Specification

The plaintiff seeks to recover the full amount due him for his interest in one Chevrolet Sedan, 1924 model, No. 2F. 58637, which he and the defendant owned in common, and this suit is to recover the value of his interest therein, to wit, Five hundred and eighteen Dollars ($518.00), with interest from the date of the writ, which said defendant promised to pay him."

Trial by jury. At the close of the plaintiff's evidence the defendant moved for a nonsuit upon the ground that "if there was

any trade at all it was based upon an illegal consideration." The court (*Burque*, J.) granted this motion, and the plaintiff excepted.

The parties themselves were the only witnesses who testified. The plaintiff called the defendant as his first witness. Upon direct examination she testified as follows: "Q. Now you and Henry Harlow were good friends for quite a while, weren't you? A. Yes. Q. And you went around together? A. Not that I know. Q. You were a friend of his, weren't you? A. In a way, yes. Q. Yes, in a way. And he was your friend in a way, wasn't he? A. Yes, he was a friend. Q. In other words, you were his mistress and he was your lover? A. Not that I know of. Q. You didn't know about that? A. No, I didn't."

Her version of the transaction in question was that the plaintiff let her have five hundred and thirty-eight dollars to make up the purchase price of an automobile, upon her verbal promise to give him a mortgage back; that subsequently, after the plaintiff had placed an attachment upon the car, a mortgage and note for the above amount was duly executed; that still later the mortgage debt was paid and the mortgage discharged. The note with the signature torn off and the mortgage, bearing a record of its discharge, were produced in evidence.

The plaintiff testified on direct examination that he got to be "intimately acquainted" and "chummy" with the defendant in the spring of 1924 and that prior to the transaction in question they had owned a Buick automobile together, which was finally sold; that about a month afterward the defendant asked him to let her have the money to make up the price of a Chevrolet car "and she teased so hard, finally I told her I would let her have the money. She promised we should have the car together and go anywhere that I wanted to go with the car any time that I wanted to. . . . So Monday morning she come up to the house and I had the money, and I gave it to her, and she went away." That subsequently she failed to take him on a trip when requested "but she kept right out of my sight, and I made up my mind that probably she was calculating to skip with my money that is, beat me out of it. So I went and attached the car and got a mortgage on it." The mortgage was for five hundred and thirty-eight dollars, payable at the rate of twenty dollars per month, and one payment of twenty dollars was made upon it.

After this, the plaintiff testified "it ran along a little while and she come over to the house, and said she didn't think she was going

to be able to pay any more, that her friend that she was getting money off from was out of a job and she couldn't pay it; she wished she had done as she agreed . . . and she kept coming over to the house right along after that when she got her car put up, she come over to the house, and she kept coming right along and said she wished she had done as we agreed; we would have the car together, and she couldn't pay for it. Well, I says, 'as long as you can't pay for it and you are willing to do as you agreed, we will have the car together,' so we went along in that way for a while."

In regard to the surrender of the note and mortgage, he testified as follows: "Well, she come to me and she says, 'I have been doing as I agreed, ain't I?' I says 'Yes, no fault to find with you.' 'Now,' she says 'you have got some children, and,' and she says, 'if anything should happen to you, they would come and take the car away.' I says, 'Most likely, they would, if they didn't know the trade.' 'Well,' she says 'you ought to give me that mortgage, and' she says 'we will have the car together just the same.' Well, I suppose I got a little foolish. I thought she was going to do as she agreed; she had all winter that far, and I gave her the mortgage. . . . I signed my name with a lead pencil, and she went away with it." He denied that the defendant paid him any money when the mortgage was discharged.

Upon cross-examination the plaintiff testified as follows: "I didn't run a car. I don't like to run a car. Q. Then what did you buy it for? A. I bought it because she liked to run the car, and she wanted to go in company with me, and I could ride. Q. She was going to live with you like a man — A. No, I don't mean that — Q. Then there wasn't to be any illicit relations between you two? You know what that means? A. Yes, there was. Q. Was that a part of the bargain, that this was going right along in the same old way? A. That wasn't a part of the bargain. The understanding was that she could go to ride — . . . Q. Now, Mr. Harlow, did you have a little proposition with this lady, you claim that she was to sort of be your mistress? A. Well, we had a little proposition; yes, sir. Q. And if it hadn't been for that, you wouldn't have had anything to do with her automobiles, would you, to be honest? A. Oh, yes. Q. That was what done the trick? A. That wasn't all wholly; that went with it. Q. That was sort of important, wasn't it? A. Yes. Q. Now everything went along all right until that end of the bargain sort of broke down; that was really the trouble, wasn't it, Mr. Harlow? A. No, sir. Q. Wasn't it? A. She come to see me all

winter until she got ready to get out of the car, and then she didn't
come near me. Q. Then you said everything was all lovely until
she got ready to get out of the car? A. Yes. Q. Then, just as soon
as she gets out of the car, things change? A. She wouldn't look at
me. I thought that had changed some."

*Henry N. Hurd* and *Raymond Trainor* (of Vermont) (*Mr. Hurd,*
orally), for the plaintiff.

*Barton & Shulins* (*Mr. Barton* orally), for the defendant.

BRANCH, J. The meaning of the plaintiff's testimony above set
forth is clear beyond question. He admitted upon cross-examination
that when the car was purchased illicit relations between him and
the defendant were contemplated, that he had a "little proposition"
with the defendant by which she was to be his mistress, and while
this was not "wholly" what "done the trick," it was "sort of im-
portant." The circumstance that when questioned regarding these
matters he at first denied the facts which he later admitted only
added to the convincing force of the admissions when they were
finally made.

Furthermore, the cross-examination is entirely consistent with the
direct examination, for the direct examination is full of references
to the defendant's doing "as she agreed" and "coming over to the
house," the meaning of which, if at any time doubtful, was eluci-
dated by the disclosures of the cross-examination. The only sensible
interpretation of plaintiff's testimony is that he admitted that an
important part of the consideration for the financial help which he
gave to the defendant in the purchase of the automobile in question
was her agreement to serve as his mistress. If this admission binds
the plaintiff and is to be accepted as conclusively establishing the
fact admitted, it follows that the ruling of the trial court was correct.

The plaintiff argues that in spite of this admission he was entitled
to go to the jury because "the defendant's testimony squarely con-
troverts this. She testified clearly that such relation was not the
consideration, because she said it did not exist. This, on the view
most favorable to the defendant, raised a question in which the
plaintiff had the right to take the judgment of the jury. . . . The
apparent conflict between the testimony of the plaintiff and the
witness Leclair should be resolved in favor of the plaintiff."

It is undoubtedly the general rule in this state that upon a motion

for a nonsuit or a directed verdict a plaintiff is entitled to have the case considered upon that interpretation of the evidence which is most favorable to him. *Burke* v. *Railroad, ante,* 350; *Janvrin* v. *Powers,* 79 N. H. 44; *Williams* v. *Duston,* 79 N. H. 490; *Weeks* v. *Company,* 78 N. H. 26.

. The operation of this rule is not limited to the testimony of outside witnesses but applies to that of parties as well. "There is no sound reason why the familiar doctrine that a party may contradict, though not impeach, his own witness, should not, if the circumstances are consistent with honesty and good faith, be applied when he is himself the witness. . . . In other words, the law recognizes the fact that parties, as well as other witnesses, may honestly mistake the truth, and requires juries to find the facts by weighing all the testimony, whatever may be its source." *Hill* v. *Railway,* 158 Mass. 458. Thus, in *Seaver* v. *Railway,* 78 N. H. 584, it was held that where the testimony of the plaintiff was conflicting she was entitled to the most favorable interpretation of it, and in *Hurlburt* v. *Company,* 76 N. H. 469, it was held that the plaintiff was entitled to the most favorable interpretation of an equivocal statement which might or might not be construed as an admission.

Does it follow from this rule that a plaintiff of average intelligence, in full possession of his faculties, who testifies to facts peculiarly within his knowledge which, if true, utterly destroy his case, has a right to go to the jury and seek a verdict based upon a finding that his version of the facts is false? This point does not appear to have been expressly decided in this state, but in many cases the court has used language which indicates, at least, a partial agreement with the statement of the Georgia court that it "can never be unfair to a party laboring under no mental infirmity, to deal with his case from the standpoint of his own testimony as a witness." *Western &c. Railroad Co.* v. *Evans,* 96 Ga. 481. Thus, in *Bliss* v. *Brainard,* 41 N. H. 256, it was said, "At all events, the plaintiff's own testimony tended to show the contract for cartage and freight to have been entered into for the express purpose of carrying into effect the sale of liquors in violation of law, and to have been, therefore, one of those contracts which a court of justice will not lend its aid to enforce"; and in *Collins* v. *Company,* 68 N. H. 196, it was said, "When, as in the case of this plaintiff, he admits he knew of the danger and comprehended it, it would be as absurd as it manifestly would be unjust to permit a recovery on the ground that his employers did not warn him of that danger"; and in *Jennings* v. *Rail-*

*road, ante,* 323, it was said, "It is claimed that the plaintiff was
ignorant of that danger, and that the defendant should therefore have
warned him about it. . . . The complete answer to this argument
is found in the plaintiff's own testimony."

A similar attitude on the part of the court is discernible in *Bursiel*
v. *Railroad, ante,* 363; *Bennett* v. *Company,* 74 N. H. 400; *O'Hare* v.
*Company,* 71 N. H. 104; *Hanley* v. *Railway,* 62 N. H. 274.

In Massachusetts, since *Hill* v. *Railway, supra,* was decided, it
has many times been held that parties were bound by their own
testimony. *Sullivan* v. *Railway,* 224 Mass. 405; *Sullivan* v. *Ashfield,*
227 Mass. 24; *Goodwin* v. *Company,* 239 Mass. 232; *Gould* v. *Converse,* 246 Mass. 185; *Will* v. *Railway,* 247 Mass. 250; *Fitzpatrick* v.
*Railway,* 249 Mass. 140.

In other jurisdictions there appears to be an increasing tendency
to hold that "no litigant can successfully ask a court or jury to
believe that he has not told the truth" (*Massie* v. *Firmstone,* 134 .
Va. 450, 462), and that a party must therefore stand or fall by his
own testimony. *Stein* v. *Corporation,* 232 Mich. 322; *Stearns* v.
*Railway,* 166 Iowa 566; *Virginia &c. Company* v. *Godsey,* 117 Va.
167; *Braselton* v. *Vokal,* 53 Cal. App. 582; *Fowler* v. *Company,*
16 Utah 348; *Daugherty* v. *Lady* (Tex. Civ. App.), 73 So. W. Rep. 837;
*State* v. *Brooks,* 99 Mo. 137; *Atlanta &c. Company* v. *Owens,* 119 Ga.
833; *Wilson* v. *Blair,* 65 Mont. 155; *Durham* v. *Company,* 22 Kan. 232;
*Van Meter* v. *Zumwalt,* 35 Ida. 235; *Bulkley* v. *Company,* 187 App.
Div. 103.

A search for a general principle deducible from the foregoing cases
does not yield satisfactory results. The attempts of some courts to
draw an analogy between the statements of parties on the witness
stand and judicial admissions contained in pleadings and agreements
of counsel (*State* v. *Brooks, supra; Stearns* v. *Railway, supra*) is not
entirely convincing. 4 Wig. Ev., s. 2594. But in all these cases the
courts sense the fact that it would be "as absurd as it manifestly
would be unjust" (*Collins* v. *Company, supra*) to allow a party to
recover after he has clearly and unequivocally sworn himself out of
court. The statement which comes nearest to enunciating a true
general principle seems to be that of the Massachusetts court quoted
above, that a party may be permitted to contradict his own testimony "if the circumstances are consistent with honesty and good
faith." *Hill* v. *Railway, supra.* Most of the cases which hold that
a party is bound by his own testimony may be justified upon the
theory that they involve a finding that the circumstances under

which the party sought to escape the effect of his own admissions were not "consistent with honesty and good faith."

It appears from these decisions that among the circumstances which should be considered in such a case are the following: 1. Was the party at the time when the occurrence about which he testified took place, and when he testified, in full possession of his mental faculties? 2. Was his intelligence and command of English such that he fully understood the purport of the questions and his answers thereto? 3. What was the nature of the facts to which he testified? Was he simply giving his impressions of an event as a participant or an observer, or was he testifying to facts peculiarly within his own knowledge? 4. Is his testimony contradicted by that of other witnesses? 5. Is the effect of his testimony clear and unequivocal, or are his statements inconsistent and conflicting?

The answer to the third of these questions will determine whether the fourth is material. If a party's testimony consists only of a narrative of events in which he participated or which he observed, there is an obvious possibility that he may be mistaken like any other witness. In such a situation, if other witnesses give a different version of the occurrence, his testimony must be weighed with theirs and he will not be concluded by his own statements. But when a party testifies to facts in regard to which he has special knowledge, such as his own motives, purposes or knowledge, or his reasons for acting as he did, the possibility that he may be honestly mistaken disappears. His testimony must be either true or deliberately false. To allow him to contradict his own testimony under these circumstances would not be "consistent with honesty and good faith." Whether his statements be true or false, he will be bound by them, and contradictions by other witnesses become immaterial. He will not be allowed to obtain a judgment based on a finding that he has perjured himself.

The effect of these considerations may be summarized as follows: If a party's mental faculties are undeveloped or impaired, if his comprehension of his testimony is doubtful, if it relates to objective matters about which he may be mistaken, and he is contradicted by other witnesses, or if his statements are inconclusive, the effect of his testimony may be for the jury. But when a man of mature years and unimpaired mentality testifies understandingly and definitely to facts peculiarly within his knowledge, any rational conception of justice demands that he be judged by what he says.

In the present case, the plaintiff's testimony was of this character.

He was a man of mature years; no claim was made that he did not have average intelligence; he testified clearly and unequivocally to a fact peculiarly within his own knowledge, *i. e.*, his inducement for advancing money to the defendant. An examination of the record leads to the conclusion that in all probability the facts stated by him were true. If they are not, he must have deliberately perjured himself. In either event he is bound by what he said, and any possible discrepancy between his testimony and that of the defendant is immaterial. Reading between the lines of the plaintiff's testimony, it is easy to see that the effect of his admissions as they were made on the witness stand may have been even more conclusive than the mere language of the record would indicate. There was no error in the ruling of the presiding justice.

*Exceptions overruled.*

All concurred.