Hillsborough, } No. 3102.
Dec. 5, 1939. }

EDWARD J. MOONEY *v.* BRUNO CHAPDELAINE.

LILLIAN I. MOONEY *v.* SAME.

*Robert W. Upton* and *Laurence I. Duncan* (*Mr. Upton* orally), for the plaintiffs.

*Wyman, Starr, Booth, Wadleigh & Langdell* (*Mr. Langdell* orally), for the defendant.

PAGE, J. The accident happened upon the road between Derry and Lawrence on the evening of February 19, 1934. The highway was practically straight and afforded a view for many hundred feet. It was snowing a little, and there was a sprinkling of snow upon the surface. The concrete pavement was twenty feet wide, flanked by a tar shoulder of two feet and a further shoulder of gravel, three feet at the narrowest, but averaging nearly four feet.

The defendant was driving southerly, on his own right-hand lane. McDonald was driving northerly, came over onto the same lane, and the collision ensued. It was the claim of the plaintiffs that the dangerous course of the McDonald car was, or should have been, known to the defendant early enough so that he could have avoided the accident by the exercise of due care. It would have been enough to make a case for them if the exercise of due care would have decreased the force of the impact sufficiently to have avoided or lessened Mrs. Mooney's injuries. *Giguere* v. *Railroad*, 86 N. H. 294, 296.

As to the motions for nonsuits and directed verdicts, the defendant relies upon the supposed incredibility of the testimony of Mrs. Mooney and other passengers in the defendant's car. But if their testimony were totally disregarded, there was still evidence to support the verdicts. Without reliance upon the "incredible" testimony, it could be found that McDonald's tire-marks crossed the middle line of the road at a point four hundred feet southerly of the point of collision; that these tire-marks were perfectly straight and gave no indication of a skid or of a blown-out tire.

The defendant's own testimony tended to make a case for the plaintiffs. He said at the trial that he was driving at the rate of thirty to thirty-five miles an hour when he first saw the lights of the McDonald car at a distance of 350 to 400 feet. He admitted having said in his deposition that the distance was 400 to 500 feet, and the jury would have been justified in accepting the greatest. The defendant further testified that upon seeing the lights he immediately took his foot from the accelerator and reduced his speed to about twenty miles an hour. He declared that the reason for his action

was the snowy condition of the road and a slight down-grade. He further said that he did not realize that McDonald's lights were on the wrong side of the road until the cars were 100 to 150 feet apart, when he braked his car and brought it practically to a stop before the collision occurred.

The jury might reasonably infer, however, that his reduction of speed was motivated by knowledge that McDonald's car was in an improper position. With such brakes as he had, and under existing conditions, the defendant admitted that he could have come to a full stop within forty feet. If the operation of the brakes had begun when the cars were 150 feet apart, the defendant would have been at a full stop before the collision occurred, for all the witnesses agreed that McDonald's speed was only fifteen to twenty miles an hour. The defendant's car weighed 3100 pounds and contained six people averaging 140 to 150 pounds. The McDonald car weighed 2400 to 2500 pounds and contained two persons totalling about 400 pounds. The jury could conclude that the defendant had sufficient warning of McDonald's position so that by reasonably prudent action he could at least have stopped completely before the collision occurred. If he had, it would have been proper to infer that the impact of a slow-moving light car upon a stationary heavier car would have greatly lessened Mrs. Mooney's injuries, even if they had not been wholly avoided.

One of the claims of the plaintiffs was that McDonald involuntarily got on the wrong side of the road. McDonald testified that a blow-out of his left front tire caused his car to skid suddenly into the south-bound lane. But there was evidence that he said soon after the accident that he was blinded and did not know that he was on the wrong side. If not proof of the fact declared, it tended strongly to impeach his testimony. Further, McDonald admitted that he had pleaded guilty to a charge of reckless driving in connection with this accident. Moreover, the nature of his tire-marks made his testimony regarding a blow-out well-nigh impossible of acceptance. The jury would have been justified in rejecting his testimony and in inferring that he did not know that he was on the wrong side of the road. He had not been drinking. The long straight lines showing his departure from the true course might have implied ignorance of where he was. It was snowing. A photograph of his car, taken within a few minutes after the accident, indicated that it lacked a wind-shield wiper. This might be thought to have been a condition accounting for ignorance.

It was the position of the plaintiffs that the defendant should have sounded his horn as a warning to McDonald. The defendant argues that he was not chargeable with notice that McDonald's car had no wiper, or that he was possibly blinded. The argument is not conclusive. McDonald's car was admittedly on the wrong side of the road. Whatever the reason for its presence there, the defendant was bound to recognize its situation as soon as average care required and to take appropriate action. There was testimony by the defendant (even if Mrs. Mooney were not to be believed) that he actually saw McDonald's lights when they were 500 feet away. The jury could have found (independently of her testimony and her supposed remarks of warning) that the defendant, if in the exercise of due care, would even then have realized that McDonald's car was on the wrong side of the road and that McDonald might be inattentive or ignorant of his position. If so, it might also be found that due care required the defendant to try to arouse McDonald by sounding his horn. If the horn had been sounded, it could not be conclusively found that McDonald could not or would not have swung to his right in season to avoid the collision. The probability that he would have done so in the course of hundreds of feet at his slow speed cannot be said to be conjectural. Conclusive effect could not be given to McDonald's statement that a signal would not have permitted him to do so, for that inference was based upon McDonald's testimony (which the jury could reject) that a blow-out caused his car to skid across the middle line and go out of control so close to the defendant's car that he had no time for action.

Totally ignoring the "incredible" testimony of Mrs. Mooney and other passengers, it could be found that a driver of average prudence in the defendant's position would have realized, before the defendant did, that there was a situation calling for action earlier than what was taken, or of a different character, and that his failure to act was at least a contributing cause of Mrs. Mooney's injuries. The motions for nonsuits and directed verdicts were properly denied. There was no error in denying the motions to set the verdicts aside. *Wisutskie* v. *Malouin*, 88 N. H. 242.

Since the exceptions to evidence were neither briefed nor argued, they are assumed to have been waived.

In the course of argument, counsel for the plaintiffs said: "If Mr. McDonald was driving that night with his windshield clouded with snow—and you can see in the photograph whether he had a windshield wiper—and involuntarily got over on the wrong side of the

road and was blinded by snow on the windshield, a horn sounded in warning—." At this point defendant's counsel interrupted: "Exception, in the absence of evidence of those facts." The court merely said: "Noted."

The argument was then continued: "—would have aroused him from that situation of danger. There is evidence of snow sticking to the defendant's windshield, and you will take your own knowledge as to whether it would stick to Mr. McDonald's windshield as well. We say that Mr. Chapdelaine could have sounded his horn and aroused Mr. McDonald to the danger and could have stopped his car to save his passengers from injury, and if that is so, he shared responsibility for the accident with Mr. McDonald."

The only exception that the defendant tried to take was to the first portion of the argument. It seems that he obtained no ruling and has no exception. *Whipple* v. *Railroad, ante,* 261. But aside from that, the argument as completed states the evidence correctly. The defendant testified that he had set his own wiper in motion and that otherwise he could not have seen because of snow on the windshield. In this he was supported by one of the passengers. Mrs. Mooney testified definitely that she could see through the windshield, though the wiper was not working. She knew it was not working, for she did not see it and would have seen it if it had been. The doctrine of *Harlow* v. *Leclair,* 82 N. H. 506, is now invoked by the defendant, who says that, whatever the reason for agreement that the defendant had good vision, the jury were bound to believe Mrs. Mooney's testimony that it was not because the wiper was clearing snow that otherwise would have stuck to the windshield. If there is anything to this contention, it was not brought to the attention of the trial court for a ruling, and no ruling was obtained. It is significant that, after interruption, the argument was completed and built up by specific reference to the defendant's testimony (upon which the defendant now says the jury could not rely) without objection, ruling or exception.

Two state police officers, who investigated the accident, testified for the defendant that they estimated, but did not actually measure, the length of the wheel-marks of McDonald's car and called it sixty to seventy-five feet from the point where they found the car to the point where the marks crossed the middle line of the road. In argument, counsel for the plaintiffs said: "They saw there on the road two straight lines leading, as they thought, from the rear of the McDonald car back to the center of the road. They didn't tell you

whether they measured along from the left wheel or whether they took the distance along the right wheel, and with the gradual approach of that curve, that itself would make a substantial difference in where the two crossed the center of the road."

Upon objection that the inference could not be made, and exception before a ruling, the court said: "Exception noted. Go ahead." If this be understood as intended as a ruling that the argument was permissible, it is enough to say that the inference suggested was inescapable.

Other exceptions to argument, though neither briefed nor argued, have not been waived. An examination of them suggests no ground for a new trial.

The defendant requested the court to give the following instruction to the jury: "If you find that Mr. McDonald was driving on his own side of the road until a distance of 60 to 70 feet from the point of collision, and thereafter came over to the westerly side of the highway and collided with the defendant's car, you must on the basis of the testimony in this case return your verdicts for the defendant." The court denied the request, perhaps on the ground that it would select certain evidence for particular stress.

In any event, the instruction sought could not have been given with any propriety. The shortest estimate of the distance in question was 60 to 75 feet from the middle line to the rear wheels of the McDonald car after it came to rest. Add the length of the car, and it becomes apparent that the distance traversed on the wrong side of the road was 75 to 90 feet. While McDonald was traveling this distance, the defendant was traveling rather further. So the defendant might have seen McDonald's headlights on the wrong side of the road, upon the best state of the evidence for his purposes, when they were more than 150 feet, or even more than 180 feet from his own headlights. At 150 feet, as already noted, there was a case for the jury.

Other requests of similar nature were properly denied for similar reasons.

There remains another request: "You are instructed as a matter of law that irrespective of whose testimony you believe in this case, you cannot return verdicts for the plaintiffs on the theory that Mr. Chapdelaine could or should have stopped his car to enable his passengers to alight after the course of the McDonald car was appreciated." The request assumed belief in the allegedly incredible testimony of Mrs. Mooney, which tended to establish the possi-

bility that the defendant might have stopped in season to permit her to alight. It was properly denied.

The defendant is understood to have waived his exception to the instructions given.

*Judgments on the verdicts.*

All concurred.

---

ON REHEARING. After the foregoing opinion was filed the plaintiff moved for a rehearing.

*Robert W. Upton* and *Laurence I. Duncan* (*Mr. Duncan* orally), for the motion.

*Wyman, Starr, Booth, Wadleigh* and *Langdell* (*Mr. Langdell* orally), opposed.

PAGE, J. The rehearing involved the point raised by the defendant's request for an instruction that no verdict could be returned on the theory that Mr. Chapdelaine could or should have stopped his car to enable his passengers to alight after the course of the McDonald car was appreciated.

The plaintiff's testimony warranted the inference that the defendant knew that the McDonald car was on the wrong side of the road when it was at the distance of 400 to 500 feet. The defendant's testimony might be thought to lend some color to this. It could be found that a stop by the defendant (possible within forty feet, as he testified) would have given the plaintiff time to alight. This would be true if the brakes had been applied when the cars were 300 feet apart, and possibly when they were somewhat closer.

Under these circumstances, it cannot be said as a matter of law that there was no duty to stop in order that the plaintiff might get out. It would be a question for the jury whether ordinary care required the defendant to stop or to retain control of the car by continued motion, with a last-moment attempt to swerve out of McDonald's course. "Whether it is the duty of a driver on the right side of the road seeing an automobile approaching on the wrong side of the road to stop to avoid a collision cannot ordinarily be determined as a matter of law. The driver who is on the right side may

assume, on the first appearance of the other vehicle, that it will change its course, and the particular point of time when he is no longer warranted in indulging such assumption is for the jury in an action for injuries resulting from a collision." Blashfield, Cyclopedia of Automobile Law and Practice, s. 787. See also *Johnson* v. *Burnham*, 198 Wash. 500; *Breedlove* v. *Galloway*, 109 W. Va. 164; *Pinder* v. *Wickstrom*, 80 Ore. 118; *Whitworth* v. *Riley*, 132 Okla. 72.

*Former result affirmed.*

All concurred.