RENDERED:  FEBRUARY 14, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0093-MR

KELLIE E. DENTON, AS CO-
ADMINISTRATOR OF THE ESTATE
OF WILLIAM A. RAINES, III;
JEREMY RAINES; JOLIE RAINES;
AND WILLIAM A. RAINES, IV, AS
CO-ADMINISTRATOR OF THE
ESTATE OF WILLIAM A. RAINES,
III                                                          APPELLANTS


               APPEAL FROM JEFFERSON CIRCUIT COURT
v.             HONORABLE ANNIE O'CONNELL, JUDGE
               ACTION NO. 17-CI-003043


MARK NUNLEY, M.D. AND
LOUISVILLE EMERGENCY
MEDICINE ASSOCIATES, P.S.C.                                  APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ACREE AND CALDWELL, JUDGES.

CALDWELL, JUDGE:  The Estate of William A. Raines, III, appeals from a

judgment on a jury verdict in favor of Mark Nunley, M.D. in a wrongful death action alleging medical negligence in failing to diagnose and treat an aortic dissection. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Raines arrived at the emergency department of Baptist East Hospital ("Baptist") shortly after midnight on November 28, 2016, presenting with chest pain. Upon admission, he was evaluated and treated by Dr. Nunley. Mr. Raines described the pain in his chest as being possibly indigestion with its onset occurring about an hour prior, after a long day of driving had culminated in having dinner with friends at a restaurant. An electrocardiogram ("EKG") and chest x-ray were performed at this time, although Dr. Nunley observed all cardiovascular findings to be within normal limits. Aside from chest pain and belching, records reflect Mr. Raines denying any other symptoms. He was administered pain medication, as well as medication for treatment of nausea and acid reflux. After Mr. Raines reported a resolution to his chest pain around 4:00 am, he was discharged with instructions to see a cardiologist.

Within minutes of the discharge, Mr. Raines returned to the Baptist emergency department and reported his chest pain had returned before he could even exit the hospital's parking lot. Mr. Raines was readmitted and again assessed by Dr. Nunley. An on-call cardiologist, Dr. Rudolph Licandro, was dispatched and, by telephone, admitted Mr. Raines to telemetry for observation. However,

Mr. Raines remained in the emergency department while waiting for a bed to open in the telemetry department.

Cardiologist Dr. Jesse Adams, a partner of Dr. Licandro, arrived at Baptist and examined Mr. Raines at around 7:30 am. Dr. Adams' note for this time shows Mr. Raines was indicating some discomfort in his chest, but no acute distress, and having a normal heart rate and rhythm. Following the examination, Mr. Raines was transported to the telemetry floor. However, before connections to telemetry monitors were completed, he reported severe chest pain. Rapid response efforts were not successful, and Mr. Raines was pronounced deceased shortly thereafter. An autopsy determined Mr. Raines' death was caused by an acute aortic dissection.

On June 15, 2017, the Estate for Mr. Raines filed a Complaint in Jefferson Circuit Court alleging medical negligence by Dr. Nunley, Dr. Licandro, Dr. Adams, as well as Baptist Health.

On August 30, 2019, the Estate filed a CR[1] 26.02 disclosure with the trial court. Three physicians were identified in the disclosure as having been retained by the Estate to render testimony at trial. Dr. Gregory J. Fermann, an emergency medicine physician, was anticipated to render an opinion that Dr. Nunley and Dr. Licandro should have suspected an aortic dissection and ordered a

---

[1] Kentucky Rules of Civil Procedure.

computerized tomography ("CT") scan of Mr. Raines' chest shortly after his return to the emergency department. The disclosure indicated Dr. Robert M. Bojar, a cardiothoracic surgeon, shared the views of Dr. Fermann. The disclosure also stated Dr. Bojar opined that had a chest CT been performed after Mr. Raines' readmission to Baptist, but prior to 7:00 am, there would have been sufficient time to discover and repair the aortic dissection and Mr. Raines' death could have been avoided. The disclosure indicated a third proffered medical expert, vascular surgeon Dr. Benjamin Brooke, "also agrees with the opinions expressed by Drs. Fermann and Bojar." No additional opinion regarding the case was indicated to be held by Dr. Brooke, although the disclosure indicated he would "testify regarding the medical literature on the subject matter." A deposition of Dr. Brooke, which the Estate intended to read to the jury at trial, took place on February 9, 2023.

A jury trial began on February 21, 2023. All defendants aside from Dr. Nunley had been dismissed prior to the trial.

At trial, the Estate's experts testified consistently with the opinions recited in the CR 26.02 disclosure. Expert witnesses for Dr. Nunley expressed opinions that Dr. Nunley had not breached the standard of care and disputed many aspects of the opinions of the Estate's expert witnesses.

Multiple witnesses were questioned regarding an article titled "Evaluation of the Adult with Chest Pain in the Emergency Department" which

-4-

had been published in 2016 by UpToDate, an online database of information for physicians. The article lists six potential causes of chest pain which present an immediate threat to a patient's life: acute coronary syndrome, aortic dissection, pulmonary embolism, tension pneumothorax, pericardial tamponade, and mediastinitis (esophageal rupture). Differential diagnosis of the six causes is discussed extensively in the article's body. Graphics depicting an algorithm titled "Emergency department approach to chest pain" are included and referenced in the article, as well as two tables titled "Presentations of aortic dissection based on affected structures" and "Differentiation of life-threatening causes of chest pain[.]" The introductory section of the article contains a sentence which was a particularly frequent subject of discussion and inquiry by the Estate: "[c]linicians in the ED focus on the immediate recognition and exclusion of life-threatening causes of chest pain."

Dr. Nunley was initially called to testify during the Estate's case. At the close of the Estate's case, it made a motion for a directed verdict. The Estate argued Dr. Nunley had made statements during his testimony that were judicial admissions and conclusively established the standard of care and his breach thereof. The motion was denied by the trial court.

At the close of the case, following closing arguments, the jury rendered a 10-2 verdict in favor of Dr. Nunley. This appeal follows. Further facts will be provided as necessary in our analysis.

**Applicable Standards of Review**

*Motion for a Directed Verdict*

A motion for directed verdict "raises only questions of law as to whether there is any evidence to support a verdict." *Harris v. Cozatt, Inc.*, 427 S.W.2d 574, 575 (Ky. 1968) (emphasis added). Accordingly, where there is any "conflicting evidence, it is the responsibility of the jury, the trier of fact, to resolve such conflicts." *Daniels v. CDB Bell, LLC*., 300 S.W.3d 204, 215 (Ky. App. 2009). The trial court should avoid consideration of the credibility or weight of proffered evidence. "[A] trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998) (citation omitted). The moving party has a high burden to meet. *Louisville Metro Gov't v. Ward*, 610 S.W.3d 295, 307 (Ky. App. 2020).

"On appellate review, we will reverse the trial court's ruling only if we find that the jury could not have reasonably reached its verdict on the basis of the evidence before it." *Belt v. Cincinnati Ins. Co.*, 664 S.W.3d 524, 530 (Ky. 2022) (internal quotation marks and citation omitted). Only where the jury's result is "palpably or flagrantly against the evidence" may we reverse the trial court's decision to deny a motion for a directed verdict. *Lewis v. Bledsoe Surface Mining*

*Co.*, 798 S.W.2d 459, 461-62 (Ky. 1990) (internal quotation marks and citation omitted).

The Estate argues it was entitled to the directed verdict on the basis of judicial admissions made by Dr. Nunley during his trial testimony. The determination of whether trial testimony constitutes a judicial admission is a question of law subject to *de novo* review. *Witten v. Pack*, 237 S.W.3d 133, 136 (Ky. 2007).

*Jury Instructions*

Both parties assert we should review the trial court's instructions *de novo*. But binding precedent from our Supreme Court shows that the *de novo* standard does not apply to all jury instruction issues. In *Sargent v. Shaffer*, the Kentucky Supreme Court distinguished between two types of instructional errors that determine the appropriate standard of review. 467 S.W.3d 198, 202-04 (Ky. 2015), *overruled on other grounds University Medical Center, Inc. v. Shwab*, 628 S.W.3d 112, 129 (Ky. 2021). "[T]he trial court has no discretion to give an instruction that misrepresents the applicable law." *Id.* at 204. Accordingly, a *de novo* standard of review is appropriate where the party seeking review alleges the trial court's instruction did not accurately present the applicable legal theory of the case. *Id.* at 204. However, where the allegation is that the trial court gave an

instruction unsupported by the evidence or failed to give an instruction required by the evidence, the correct standard of review is abuse of discretion. *Id*. at 203.

The Estate alleges the trial court failed to give an instruction required by the evidence – specifically, Dr. Nunley's testimony. Accordingly, we review the allegation of error regarding the jury instructions here for an abuse of discretion.

*Exclusion of Expert Testimony*

Regarding the Estate's allegation the trial court erred in excluding Dr. Brooke's expert testimony as cumulative, we review for abuse of discretion. *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 720 (Ky. 2009).

## ANALYSIS

**I. Dr. Nunley's statements were not judicial admissions and did not entitle the Estate to a Directed Verdict**.

The Estate argues statements made by Dr. Nunley during his testimony were judicial admissions requiring the trial court to grant a directed verdict. First, it argues Dr. Nunley conceded that the UpToDate quotation: "[c]linicians in the ED focus on the immediate recognition and exclusion of life-threatening causes of chest pain[,]" was an accurate statement of the applicable standard of care. It contends this admission occurred on multiple occasions, citing to testimony such as the following exchange:

Q. Okay. Okay. So this paper, right off the bat, lays out a, I'd say a, a foundational premise that says 'Clinicians in the emergency department' – and this is in the context of evaluating chest pain – 'Clinicians in the emergency department focus on the immediate recognition and exclusion of life-threatening causes of chest pain. Patients with life-threatening etiologies for chest pain may appear deceptively well, manifesting neither vital sign or physical examination abnormalities.' Let's go over that first sentence 'Clinicians in the emergency department focus on the immediate recognition, and exclusion of life – threatening causes of chest pain.' Do you agree that that appropriately expresses what is expected of a reasonably competent emergency room physician evaluating chest pain in the emergency department?

A. Yes, I do.

The Estate cites the following exchange as another instance of Dr. Nunley making a judicial admission regarding the standard of care:

Q. So there's no real debate. You've accepted that as the standard of care, in essence. So your job was to immediately recognize those items that were life-threatening, and to exclude them with testing immediately?

A. To exclude them to the best of probability, yes.

The Estate characterizes these, and similar exchanges, as an admission of the applicable standard of care to be applied in the action: "Dr. Nunley accepted the immediate recognition and exclusion of life-threatening explanations as the applicable standard of care at least seven (7) times." Further, the Estate argues, Dr. Nunley made judicial admissions he breached this standard of care by failing to

-9-

order a CT scan for Mr. Raines. In support of this element, the Estate cites

primarily to two portions of Dr. Nunley's testimony. One is the following:

> Q. I mean, these are not like medical terms of art, but
> clinicians in the emergency department focus on the
> immediate recognition and exclusion of life-threatening
> causes. Is that . . . ambiguous to you?
>
> A. No.
>
> Q. Immediate means right now, correct?
>
> A. Yes.
>
> Q. Highest priority, right?
>
> A. Yes.

The other testimony the Estate primarily relies upon in this regard is the

following:

> Q. Right, right. And we don't need to go back through
> whether you accept that that's the standard of care in the
> emergency – we won't need to do that, do we? You
> already told us that the standard of care required
> immediate recognition and exclusion. You already told
> us that right?
>
> A. Yes.
>
> Q. And you, and you, and you didn't do that. You didn't
> immediately –
>
> A. I did do that.
>
> Q. – attempt to exclude –
>
> A. I –

Q. – [by] having a CT angiogram, did you?

A. I didn't do a CT angiogram; I was attempting to exclude the acute coronary ischemia by consulting Cardiology and getting them to see the patient and do further testing.

Q. Right, and just so we are in agreement, because you told me that, that language was not ambiguous, that's not an immediate plan of action for this patient, is it?

A. It's an urgent but not immediate plan of action.

At the close of plaintiff's case, the Estate moved for a directed verdict on the issue of liability and filed a written memorandum citing to *Sutherland v. Davis*, 286 Ky. 743, 151 S.W.2d 1021 (1941). The trial court had opportunity to review the Estate's memorandum and hear its arguments on the afternoon of February 27, 2023.

After considering the Estate's motion, the trial court denied it, citing to a discussion by the *Sutherland* court of five circumstances for consideration in determining whether a testimonial statement is a judicial admission. *See* 151 S.W.2d at 1024.

The trial court focused on the fifth factor, finding that Dr. Nunley's statements regarding the standard of care were not sufficiently clear and unequivocal to qualify as judicial admissions. A handwritten order denying the Estate's motion found that "Dr. Nunley's testimony does not amount to a judicial

admission[.]" The Estate's motion was renewed at the close of all evidence and again denied.

The Estate again raised the issue in a motion for judgment notwithstanding the verdict ("JNOV"). In a written opinion, the trial court found:

> The [Estate] first contend[s] that when ruling on the Directed Verdict Motion, the Court relied not on the holding of *Sutherland v. Davis*, 151 S.W. 2nd 1021(Ky. 1941), but on the *dicta*. Specifically, it contends that the Court relied on the discussion of the ALR article citing a New Hampshire case styled *Harlow v. Laclair*, 82 N.H. 506.
>
> Under the analysis of judicial admissions from Kentucky law and from the totality of the evidence of this case, the testimony set forth in [the Estate's] argument does not rise to the level of a conclusive judicial admission and their Motion is denied on this issue.

The Estate, on appeal, reiterates its argument that the trial court's reliance on the factors for consideration in the *Sutherland* opinion was an erroneous misapplication of *dicta* from the case. The Estate alleges no Kentucky appellate courts have followed *Sutherland*'s consideration of these circumstances. Furthermore, the Estate argues, even if the circumstances listed in *Sutherland* were appropriate for the trial court's consideration, the trial court's analysis was erroneous because each of those factors weigh in favor of finding Dr. Nunley's statements were judicial admissions. We disagree.

> [A]mong the circumstances which should be considered in such a case are the following: (1) Was the party at the

-12-

time when the occurrence about which he testified took place, and when he testified, in full possession of his mental faculties? [2] Was his intelligence and command of English such that he fully understood the purport of the questions and his answers thereto? (3) What was the nature of the facts to which he testified? Was he simply giving his impressions of an event as a participant or an observer, or was he testifying to facts peculiarly within his own knowledge? (4) Is his testimony contradicted by that of other witnesses? (5) Is the effect of his testimony clear and unequivocal, or are his statements inconsistent and conflicting?

*Sutherland*, 151 S.W.2d at 1024 (quoting *Harlow v. Laclair*, 82 N.H. 506, 136 A. 128, 131, 50 A.L.R. 973 (1927)).

The fifth circumstance for consideration, articulated in *Sutherland* and referenced in the trial court's findings during the hearing on the Estate's motion, considers whether the "effect" of the testimony in question is "clear and unequivocal, or . . . inconsistent and conflicting?" *Sutherland*, 151 S.W.2d at 1024. Despite the Estate's arguments, Kentucky decisions on judicial admissions have considered this circumstance. *See Arnett v. Arnett*, 293 S.W.2d 733 (Ky. 1956) (plaintiff-passenger's testimony tending to reflect on the defendant-driver's sobriety was not sufficiently definite and unequivocal to conclude the issue); *Head v. Russell*, 307 S.W.2d 557, 559 (Ky. 1957) (testimony of plaintiff-passengers did not "establish unequivocally that the sole cause of the accident was the negligence of another").

After hearing the Estate's arguments for a directed verdict, the trial court found that "given the totality of Dr. Nunley's testimony. . . . his statements were not so clear and unequivocal as articulated by [the Estate] in this motion." The trial court premised this by noting the standard of care is a much more nuanced issue than matters of fact in an automotive negligence case such as *Sutherland*.

There is no dispute regarding the first two circumstances recited in *Sutherland*. Regarding the third, the Estate argues that "what the applicable standard of care required with respect to the evaluation of an adult with chest pain in the emergency room, and whether his care of Mr. Raines complied with the standard of care" were facts peculiarly within Dr. Nunley's own knowledge. Dr. Nunley, however, argues his "purported admission addresse[d] a principle or opinion, not facts." On this point, Dr. Nunley's argument is more persuasive.

The Estate argues the sentence, "[c]linicians in the ED focus on the immediate recognition and exclusion of life-threatening causes of chest pain" is axiomatic and Dr. Nunley's agreement with it "of no more consequence to the case than an agreement that grass is green." Whether or not this is the case, the sentence does appear to express a generality rather than a substantive statement on when a specific course of action, such as ordering a CT, is necessary. An expression of agreement with the general statement that emergency room doctors

first try to rule out life-threatening causes cannot reasonably be said to indicate Dr. Nunley's admission of any fact peculiarly within his own knowledge.

It is likewise with Dr. Nunley's agreement as to the definition or lack of ambiguity in the word "immediate" as well as his agreement that a CT is the best diagnostic test for detection of aortic dissection. To the extent the testimony in question contains statements of fact, rather than expressions of opinion or agreement with general principles of emergency medicine, none could be reasonably described as facts peculiarly within the knowledge of Dr. Nunley. Here, again, is a circumstance discussed in *Sutherland* which subsequent Kentucky courts have considered during examination of judicial admissions. *See Schoenbaechler v. Louisville Taxicab & Transfer Co.*, 328 S.W.2d 514 (Ky. 1959) (plaintiff-pedestrian was bound by pretrial testimony to the effect he did not look to his left after cars coming from his right had passed, this being a "fact peculiarly within his own knowledge").

The Estate argues that Dr. Nunley's experts also expressing agreement with the UpToDate quotation supports finding Dr. Nunley's "admissions" were uncontradicted. However, "[a] judicial admission is a formal statement concerning a *disputed* fact, made by a party during a judicial proceeding, that is adverse to that party, and that is deliberate, clear, and uncontradicted." *Zapp v. CSX Construction, Inc.*, 300 S.W.3d 219, 223 (Ky. App. 2009) (emphasis added). That no expert

-15-

disputed the UpToDate quotation is evidence of its generality. It does not support the Estate's assertion Dr. Nunley testified to a breach of the standard of care which was uncontradicted by other evidence. And even though Dr. Nunley's initial perception turned out to be incorrect, that an acute coronary syndrome was a more likely threat to Mr. Raines than aortic dissection, he nevertheless used "that degree of care and skill which is expected of a reasonably competent pract[it]ioner in the same class to which he belongs, acting in the same or similar circumstances." *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky. 1970).

Dr. Nunley testified that upon Mr. Raines' readmission, he followed the diagnostic path of excluding acute coronary syndrome and this did not prompt a CT. While a CT was available and the best test for an aortic dissection, it was not appropriate before ruling out more likely conditions. He considered Mr. Raines a lower risk patient for aortic dissection. Dr. Nunley also testified that as he anticipated a stress test or cardiac catheterization would be necessary, he did not want to expose Mr. Raines to repeated dye.

In other testimony, Dr. Nunley asserted the UpToDate article listed acute coronary syndrome as a higher primary, emergent and deadly condition than aortic dissection, and that his actions were consistent with the article's approach. Dr. Nunley's retained experts expressed opinions that, aside from general chest pain, Mr. Raines had no symptoms associated with aortic dissection. Viewing his

testimony as a whole, it is unmistakable that Dr. Nunley insisted he was compliant with the standard of care, including any actions required by the UpToDate article.

This testimony was supported by the opinions of Dr. Nunley's retained experts, emergency physician, Dr. John Pearson and cardiothoracic surgeon, Dr. John Brock. Their testimony indicated Dr. Nunley's pursuit of an acute coronary syndrome diagnosis was reasonable and did not require or prompt a CT scan. As a result of an absence of Mr. Raines' pain being described as "stabbing" or "tearing" but instead described as "pressing" and possible indigestion, his symptoms were not consistent with an aortic dissection. The waxing and waning nature of Mr. Raines' pain, according to Dr. Nunley's experts, was more consistent with acute coronary syndrome than aortic dissection.

The Estate emphasizes the word "immediate" in the UpToDate quotation and points to Dr. Nunley's failure to send Mr. Raines for a CT during the hours between his readmission and evaluation by a cardiologist, despite the earlier admission to telemetry. However, Dr. Nunley testified that during Mr. Raines' time in the emergency department, he continued to monitor his EKG for sudden changes. Dr. Nunley also testified that given Mr. Raines' history and symptoms, along with the inherent risks from a CT, there was nothing inappropriate with this course of action. His retained experts testified consistently.

"Manifestly, the determination by a court that a party may not contradict an admission is strong medicine and should be sparingly administered. . . . [T]he judicial admission rule 'should be applied with caution because of the variable nature of testimony and because of the ever present possibility of honest mistake.'" *Goldsmith v. Allied Building Components*, 833 S.W.2d 378, 380 (Ky. 1992) (quoting *Bell v. Harmon*, 284 S.W.2d 812, 815 (Ky. 1955)). The trial court's evaluation of Dr. Nunley's statements in the context of the "totality" of his own testimony and the other evidence in the case was correct. "[I]n determining the conclusiveness of a judicial admission by a party to an action the court should view the admitted fact in the light of all the conditions and circumstances proven in the case." *Ramsey v. Ramsey*, Ky., 291 S.W.2d 561, 562 (1956) (citing *Sutherland*, 151 S.W.2d 1021).

A directed verdict in favor of the Estate would have been proper if, under the evidence as a whole, no reasonable jury could have determined that Dr. Nunley exercised reasonable care in treating Mr. Raines. The central contention to the Estate's theory of the case is that Dr. Nunley should have ordered a CT scan. The Estate's experts expressed opinions that, according to their analysis of the circumstances of Mr. Raines' readmission, the standard of care required ordering a CT scan. Nonetheless, over the course of their testimony, experts for the Estate did

-18-

concede that, under some circumstances, the standard of care would not require a CT scan for an emergency room patient with chest pain.

Dr. Pearson argued that Dr. Nunley's care, including the decision not to order a CT, was appropriate under the approach expressed in the UpToDate article. A lay examination of the article's algorithm reveals a CT examination is not always required for an emergency room patient with chest pain. Examination of the article shows no clear or unambiguous indication a CT was required for a patient such as Mr. Raines.

Instead, it appears to be a complex question. Experts for both parties rendered extensive testimony that the decision to order a CT is based on the physician's working through a differential diagnosis considering variables, including a patient's onset of pain, the pain quality and location, associated symptoms, and risk factors. Dr. Nunley presented evidence he did not breach the standard of care; it cannot be said that no reasonable jury could determine otherwise.

## II. Jury Instructions.

The Estate argues the trial court should have given the jury a "*Sutherland* jury instruction" citing to the language that a judicial admission "allows the judge to direct the jury to accept the admission as conclusive of the disputed fact." *Sutherland*, 151 S.W.2d at 1024. The Estate argues the jury should

have been instructed that Dr. Nunley admitted he was required to comply with the specific duty of "immediate recognition and exclusion of the six life-threatening causes of severe chest pain." Having determined Dr. Nunley's statements were not judicial admissions largely dispenses of the Estate's argument. In any event, we find no error in the trial court's denial of the Estate's request to include this specific duty for Dr. Nunley in its instructions. "[I]n the practice of medicine, there are numerous variables which must be taken into account in each specific case. Specific enumeration of duties would tend to overemphasize the requirement rather than to create or expand the duty." *Hamby v. University of Kentucky Medical Center*, 844 S.W.2d 431, 434 (Ky. App. 1992).

**III. Exclusion as cumulative of proposed testimony of Dr. Brooke.**

Lastly, the Estate alleges error in the trial court's exclusion of Dr. Brooke's deposition testimony. As previously discussed, the Estate presented two medical experts who testified extensively at trial about their criticisms of Dr. Nunley's care and treatment. The trial court found the Estate failed to identify how Dr. Brooke's testimony might differ in any significant detail from the testimony of Dr. Fermann and Dr. Bojar. "In a case where testimony is excluded as being cumulative, the offering party ought to tell the court why the testimony is not cumulative." *See FB Ins. Co. v. Jones*, 864 S.W.2d 926, 930 (Ky. App. 1993).

-20-

On appeal, the Estate emphasizes Dr. Brooke's credentials and alternative specialty to Dr. Fermann and Dr. Bojar. However, Dr. Nunley points out that, by Dr. Brooke's own admission, he does not treat ascending aortic dissections as a vascular surgeon. Under KRE[2] 403, evidence may be excluded where its probative value is substantially outweighed by the danger of "needless presentation of cumulative evidence." We cannot say the trial court abused its discretion in excluding Dr. Brooke's deposition testimony as cumulative.

Further arguments in the parties' briefs not discussed herein have been determined to lack merit or relevancy to our resolving this appeal.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.


ALL CONCUR.


BRIEFS FOR APPELLANTS:

Todd P. Greer
Brian E. Clare
Zach R. Berry
Louisville, Kentucky

BRIEF FOR APPELLEES:

Gerald R. Toner
Scott E. Burroughs
Kathryn D. Duke
Louisville, Kentucky

---

[2] Kentucky Rules of Evidence.